### ILLINOIS–INDIANA CABLE TELEVISION ASSOCIATION, INC., Plaintiff-Appellant,

v.

### PUBLIC SERVICE COMMISSION OF the STATE OF INDIANA, Defendant-Appellee,

Indiana Bell Telephone Company, Inc.; Public Service Company of Indiana, Inc.; Statewide Rural Electric Cooperative, Inc.; Northern Indiana Public Service Company; Indianapolis Power & Light Company; Indiana & Michigan Electric Company; Southern Indiana Gas & Electric Company; Princeton Telephone Company; United Telephone Company; General Telephone Company of Indiana; Indiana Telephone Association; Frank J. Biddinger, Public Counselor, Continental Telephone Company of Indiana, Respondents-Appellees,

Indiana Municipal Electric Association, Inc., Intervenor-Appellee.

No. 2–979A285.

Court of Appeals of Indiana, First District.

Oct. 27, 1981.

Phillip E. Bainbridge, Highland, for plaintiff-appellant.

Linley E. Pearson, Atty. Gen., Jeff G. Fihn, Deputy Atty. Gen., Indianapolis, for Public Service Commission of Indiana.

Bruce N. Cracraft, Thomas E. Dooley, Indianapolis, for Indiana Bell Telephone Co., Inc.

Thomas W. Yoder, Livingston, Dildine, Haynie & Yoder, Fort Wayne, for Indiana & Michigan Electric Co.

Fred P. Bamberger, Bamberger, Foreman, Oswals & Hahn, Evansville, for Southern Indiana Gas and Electric Co.

Jerry P. Belknap, Indianapolis, Ronald Prater, Indiana & Michigan Electric Co., Fort Wayne, Marcus E. Woods, Christopher J. Weber, Indianapolis Power & Light Co., Indianapolis, Charles W. Campbell, Frank T. Lewis, Public Service Co. of Indiana, Inc., Plainfield, David C. Jensen, Eichhorn, Eichhorn & Link, Hammond, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for Electric Utility respondents-appellees.

NEAL, Presiding Judge.

## STATEMENT OF THE CASE

The Illinois-Indiana Cable Television Association, Inc. (CATV)[1] appeals from a determination by the Public Service Commission of Indiana (Commission) that the Commission has jurisdiction over cable television pole attachment rates, charges, and conditions.[2] (Hereinafter, in the interests of brevity and the avoidance of undue repetition, pole attachments.)

## STATEMENT OF THE FACTS

This appeal was preceded by the following events.

On January 29, 1979, the Commission, under authority of Ind.Code 8–1–2–58,[3] on its own initiative commenced an investigation into the rates and charges for cable television pole attachments to facilities regulated by the Commission.

Pursuant to 47 U.S.C.A. § 224(c)(2)[4] the Commission certified to the Federal Communications Commission (FCC) its assumption of authority to regulate the "rates, terms, and conditions for cable television attachments to facilities of regulated telephone and electric utilities" in Indiana. The Commission additionally certified, pursuant to the federal statute, that it has the authority to consider, and does consider, the interests of the subscribers of cable television services as well as the interests of consumers of regulated utility services.

On February 13, 1979, CATV, an association which represents the interests of many cable television companies in Indiana and Illinois, petitioned to intervene in the proceedings, and on February 15, 1979, moved to dismiss the proceedings based on lack of subject matter jurisdiction. On February 28, 1979, the Commission granted the petition to intervene and denied the motion to dismiss.

"State regulatory authority over rates, terms, and conditions not pre-empted by activities of Commission; certification of State regulation to Commission

(c)(1) Nothing in this section shall be construed to apply to, or to give the Commission jurisdiction with respect to rates, terms, and conditions for pole attachments in any case where such matters are regulated by a State.

(2) Each State which regulates the rates, terms and conditions for pole attachments shall certify to the Commission that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms and conditions, the State has the authority to consider and does consider the interests of the subscribers of cable television services, as well as the interests of the consumers of the utility services"

1. The acronym "CATV" derives from Community Antenna TeleVision or Cable TeleVision. Berman, *CATV Leased-Access Channels and the FCC: The Intractable Jurisdiction Question*, 51 Notre Dame Law. 145 (1975).

2. "The term 'pole attachment' means any attachment by a cable television system to a pole, duct, conduit, or right-of-way owned or controlled by a utility." 47 U.S.C.A. § 224(a)(4).

3. In pertinent part, Ind.Code 8–1–2–58 reads: "Whenever the commission shall believe... that an investigation of any matters relating to any public utility should for any reason be made, it may, on its motion, summarily investigate the same, with or without notice."

4. 47 U.S.C.A. § 224(c) states:

On February 16, 1979, a prehearing conference was held, at which evidence and testimony was presented, resulting in a Pre-Hearing Conference Order. Most of that conference was conducted off the record. The Commission found that:

"It is in the public interest to develop and adopt a uniform methodology and criteria for determination of just and reasonable rates and charges for cable television pole attachments to facilities owned by utilities subject to the jurisdiction of the Commission, and the Commission has jurisdiction over such rates and charges."

The Commission further determined that it "has jurisdiction over the subject matter of this cause and the parties named respondents herein [regulated electric and telephone utilities]. . . ."

Prior to the date set by the Commission for a final hearing, CATV filed a motion seeking the Commission to certify to this court the question of jurisdiction, to hold an additional pre-conference hearing, and to limit the scheduled hearing to the determination of whether the Commission is acting within its legally granted legislative powers. Upon the denial of this motion, CATV requested from the Commission the complete transcript and filed its assignment of errors. This appeal ensued.

In addition to the Commission, defending the Commission's action as Appellees herein are the various electric utility companies and telephone companies that intervened in the administrative proceedings.

■ The Appellees herein filed motions to dismiss or affirm contending, essentially, that the actions taken by the Commission do not constitute an appealable final order. This court, per order of September 3, 1980, denied Appellees' motions, finding that the assertion of jurisdiction over the determination of cable television pole attachments by the Commission is appealable since lack of subject matter jurisdiction may be raised at any time and that such assertion of jurisdiction is an initial and integral step in a regulatory scheme. *See In re Northwestern Indiana Telephone Company*, (1930) 201 Ind. 667, 171 N.E. 65; *Citizens Gas & Coke Utility v. Sloan*, (1964) 136 Ind.App. 297, 196 N.E.2d 290.

The federal regulatory scheme [5] empowers the FCC to regulate the rates, terms, and conditions of pole attachments to ensure that such rates, terms, and conditions are just and reasonable. 47 U.S.C.A. § 224(b)(1). However, federal regulation is yielded to state regulation upon certification by a state that:

"(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of cable television services, as well as the interests of the utility services."

47 U.S.C.A. § 224(c)(2)(A), (B). Thus,

"Any State which chooses to regulate pole attachments may do so at any time, and will preempt the [FCC's] involvement in pole attachment arrangements in that state simply by notifying the FCC that it regulates the rates, terms, and conditions for such attachments. [The federal statute] in no way limits or restricts the powers of the several States to regulate pole attachments." [6]

It is upon the Commission's certification to the FCC under 47 U.S.C.A. § 224(c)(2), *supra*, and the Commission's pronouncement of its intent to initiate procedures for the promulgation of rules and regulations concerning pole attachments that CATV bases its claim that the Commission has exceeded its legislated authority. The utilities already subscribe to technical standards regarding the physical placement, operation, maintenance, etc. of the CATV coaxial

---

5. Communications Act Amendments of 1978, Pub.L.No.95–234, § 6, 92 Stat. 35; the provisions that concern pole attachments are codified in 47 U.S.C.A. § 224.

6. Sen.Rep.No.95–580, reprinted in [1978] U.S. Code Cong. and Ad.News 109, 110. *See also, Id.*, at 120–30.

cables on utility poles.[7] The parties appear to be more concerned with the economic (rate-making) aspects of pole attachments.

At oral argument, counsel for Appellee utilities expressed concern that the federal parameters of allowable rates are too low. Under the federal statute, just and reasonable rates are to be determined according to 47 U.S.C.A. § 224(d), which states:

"Determination of just and reasonable rates; definition

(d)(1) For purposes of subsection (b) of this section, a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

(2) As used in this subsection, the term 'usable space' means the space above the minimum grade level which can be used for the attachment of wires, cables, and associated equipment."

The maximum return is to be determined by the following formula:

$$\text{MAXIMUM RATE} = \frac{\text{SPACE OCCUPIED BY CATV}}{\text{TOTAL USABLE SPACE}} \times \begin{array}{c}\text{(OPERATING EXPENSES} \\ \text{PLUS CAPITAL} \\ \text{COSTS OF POLES)}^{8}\end{array}$$

This formula thus ensures that the rate assessed CATV does not exceed the expenses attributable to that portion of usable space on the poles that it occupies. It appears from gratuitous information supplied by the parties in their briefs, but without testimonial support in the record due to the limited scope of that document, that it is the custom that the CATV companies supply their own materials and utilize their own manpower in installing and maintaining the cables along the utility poles.

### ISSUES

We restate the issues raised by CATV as follows:

I. The Commission's assumption of regulatory jurisdiction over pole attachment rates is arbitrary and capricious in that the Commission perfunctorily denied CATV's motion to dismiss the investigation, in that there was no evidence before the Commission upon which it could base its decision.

II. Cable television is not a public utility. As such, the Commission has exceeded its statutory authority in assuming jurisdiction over that industry.

III. CATV is not a consumer of utility services by virtue of its status as a lessee of utility pole space. The Commission has the power of regulation only over a utility's mandated public function. The rental of space on utility poles is only an incidental service provided by utility companies and, as such, it is not within the range of activities subject to Commission regulation.

IV. Contrary to its assertion in its certification of jurisdiction to the FCC, the Commission is not mandated to consider the interests of cable television subscribers. The Commission may consider only the interests of consumers of public services. The leasing of space on utility poles does not make one a public service

7. Telephone utilities: 170 IAC 7–1–13; "Bell System Manual of Construction for the Use of Companies Attaching Facilities to Telephone Company Poles and Occupying the Telephone Company Conduit System" (September, 1970).

Electric utilities: 170 IAC 4–1–26; National Electric Safety Code.

8. 57 C.F.R. § 1, 1409(c).

customer. Exceptions to the general rules restricting the Commission's regulatory activity do not apply in the instant case. Those exceptions would allow Commission intervention only when:

a) the non-public service begins to interfere with the public service; and

b) when cable pole attachment rates are so low as to effectively force public utility subscribers to effectively subsidize the cable television industry.

Because of our resolution of this appeal, we find it necessary to consider only the following issue:

Whether it is within the authority of the Public Service Commission to assert authority to prospectively regulate the rates, terms, and conditions of cable television pole attachments to facilities of regulated telephone and electric utilities in Indiana.

## DISCUSSION AND DECISION

CATV contends the Commission exceeded its statutory authority in certifying to the FCC, pursuant to 47 U.S.C.A. § 224(c), *supra*, its jurisdiction to regulate the rates, terms, and conditions of pole attachments, and that in so regulating it has authority to consider and does consider the interests of the subscribers of cable television services as well as the interests of the consumers of the utilities' services. Also contested is the Commission's pronouncement of its intention to initiate proceedings to promulgate rules and regulations concerning pole attachments.

■ A comment upon the scope of our review in this case is necessary to dispel a misconception apparent in the Commission's brief. Citing a number of rate-making cases, the Commission urges us to restrict our review to a determination of whether the Commission's action was based upon substantial evidence and was reasonable. The case at bar is not a rate-making case. In such cases, the role of the courts, and thus the purview of judicial review, is limited, as the determination of public utility rates is a legislative, rather than a judicial,

function. *State ex rel. Indianapolis Water Company v. Boone Circuit Court*, (1974) 261 Ind. 583, 307 N.E.2d 870. The legal question raised in this review is whether the Commission acted contrary to law in asserting its authority to prospectively regulate pole attachments. Our Supreme Court has stated:

"The courts, in reviewing the work of the Commission, must keep in mind that they only have to do with questions calling for judicial interpretation as distinguished from matters administrative. *So long as the Commission keeps within the field of regulative powers over the persons or entities over which it has jurisdiction, its orders and action with reference to such matters must be respected by the courts.* The presumption of good faith, and valid orders by the Commission must obtain until the contrary is made clearly to appear." (Our emphasis.)

*In re Northwestern Indiana Telephone Company, supra*, 201 Ind. 667, 674, 171 N.E. 65. When, as here, the allegation is made that the Commission acted contrary to law we must review the administrative proceedings to see that the Commission remains within its jurisdiction, and that it conforms to all relevant statutes, standards, and legal principles. *Southern Indiana Gas and Electric Company v. Southern Indiana Rural Electric Cooperative*, (1979) Ind.App., 386 N.E.2d 1017.

■ It has long been recognized that the Commission is a statutory board which derives its power and authority solely from statute, and unless a grant of power and authority can be found in the statute, it must be concluded there is none. *General Telephone Company of Indiana v. Public Service Commission of Indiana*, (1958) 238 Ind. 646, 154 N.E.2d 372; *Kentucky-Indiana Municipal Power Association v. Public Service Company of Indiana*, (1979) Ind.App., 393 N.E.2d 776. No provision of the Public Service Commission Act (Act), Ind.Code 8–1–2–1, *et seq.*, explicitly confers upon the Commission the power to assert regulatory authority over pole attachments. Our task is thus to review the Act to determine

whether the legislature has endowed the Commission with the contested authority.

■ Separate briefs were filed in this appeal by Appellees Public Service Commission of Indiana, Indiana Bell Telephone Company, Inc., the "Public Utility Appellees,"[9] and Southern Indiana Gas and Electric Company. The theories espoused by the various Appellees in support of the Commission's assertion of regulatory authority over pole attachments are not inconsistent, although the briefs vary considerably in emphasis, style, and depth of analysis. We do not find it judiciously expedient or necessary to the resolution of the dispute to consider each Appellee's argument individually, but in our analysis we shall endeavor to consider all of the salient points raised in defense of the Commission's action.

Manifestly, the legislature did not enact the Public Service Commission Act of 1913 with the intention of controlling or regulating the cable television industry or the television transmission facilities utilized thereby.[10] It is equally clear that the telephone and electric utilities were not created to accommodate cable television. Since facilities for the transmission and delivery of telephone and electric service were already in place when cable television provision became available, it became mutually advantageous to utilize the existing poles for the suspension of television cables; a source of additional revenue was made available to the utilities and the expense of constructing poles by the cable television companies was avoided. The fact remains, however, that the purposes in which the Appellee utilities are engaged are to provide electrical energy and telephonic communications services to the public; their purpose is not to provide the means by which other industries may transmit and deliver their products.

As have all other states, Indiana has developed a comprehensive scheme for the regulation of public utilities to ensure that the public is provided reasonable and adequate utility service at reasonable rates, while at the same time ensuring the utilities' investors a reasonable rate of return on their investment. State regulation of public utilities supplies "the missing element of competition which protects the public from excessive charges in competitive businesses." *Public Service Commission of Indiana v. Indiana Bell Telephone Company*, (1955) 235 Ind. 1, 31, 130 N.E.2d 467.

Upon review of the statutes it is clear that the Commission is empowered to regulate the rates charged by public utilities for the provision of electrical energy, telephonic communications services, water, natural gas, sewage service, motor carrier service, and others. We find no statutory provisions that explicitly empower the Commission to regulate rates or charges received by utilities for ancillary or miscellaneous business activities that are not related, directly or indirectly, to the production and delivery of the services the utilities were created to supply. We find no Indiana cases addressing the question. Indiana case law in this area has generally involved disputes arising over the rates to be charged for services of the type the utility is primarily engaged in providing.

In spite of the absence of specific statutory authority, Appellees contend that certain provisions of the Act empower the Commission to assert regulatory authority over the rates, terms, and conditions of pole attachments. The statutory sections relied on primarily involve (A) safety and adequacy of service, and (B) the rate-making authority of the Commission.

A. *Safety and adequacy of service*

Ind.Code 8–1–2–69 provides:

"Whenever, upon the investigation made under the provisions of this act, the commission shall find any regulations,

---

**9.** Indiana & Michigan Electric Company, Indianapolis Power & Light Company, Northern Indiana Public Service Company, and Public Service Company of Indiana, Inc.

**10.** Community antenna television was created in 1949. *See, Richland County v. Palmetto Cablevision*, (1973) 261 S.C. 222, 199 S.E.2d 168, 170.

measurements, practices, acts or service to be unjust, unreasonable, unwholesome, unsanitary, unsafe, insufficient, preferential, unjustly discriminatory or otherwise in violation of any of the provisions of this act; or shall find that any service is inadequate or that any service which can be reasonably demanded can not be obtained, the commission shall determine and declare and by order fix just and reasonable measurements, regulations, acts, practices or service to be furnished, imposed, observed and followed in the future in lieu of those found to be unjust, unreasonable, unwholesome, unsanitary, unsafe, insufficient, preferential, unjustly discriminatory, inadequate, or otherwise in violation of this act, as the case may be, and shall make such other order respecting such measurement, regulation, act, practice or service as shall be just and reasonable."

It is asserted on appeal, but without testimonial support in the record, that methods employed currently in cable construction and maintenance present "a myriad of potential safety hazards," and, therefore, this section invests the Commission with jurisdiction over pole attachments on the basis of safety considerations. Further, appellees assert that the ability of a utility to provide sufficient and adequate service generally is impaired by the installation and maintenance of cables along utility poles, and that regulatory authority is thus conferred.

We disagree. While the Commission did assert its jurisdiction over pole attachments following an investigation authorized by Ind.Code 8–1–2–58, *supra*, it made no finding that any particular practice, act, or service currently employed is unsafe, or that a particular service is insufficient or inadequate. This statutory section affords the Commission the power to correct what it determines to be an unsafe condition or an inadequate provision of service. Appellants concede, and we agree, that to the extent Commission intervention is necessary to ensure the safe operation of a utility, and to ensure uninterrupted service, the Commission has authority to determine in what manner, if at all, television cables are to be attached to utility poles. The Commission's power in this regard under the statute is to be determined from the perspective of the regulated utility and its subscribers, for there is no statutory authority for it to regulate any aspect of cable television.

Ind.Code 8–1–2–83 states:

"*No public utility, as defined in section one of this act, shall sell, assign, transfer, lease, or encumber its franchise, works or system to any other person, partnership or corporation, or contract for the operation of any part of its works or system by any other person, partnership or corporation, without the approval of the commission after hearing.* And no such public utility, except temporarily or in case of emergency and for a period of not exceeding thirty (30) days, shall make any special contract at rates other than those prescribed in its schedule of rates theretofore filed with the public service commission, and in force, with any other utility for rendering any service to or procuring any service from such other utility, without the approval of the commission. It shall be lawful, however, for any utility to make a contract for service to or from another utility at rates previously filed with and approved by the public service commission and in force. The approval of the commission of the sale, assignment, transfer, lease or encumbrance of a franchise or any part thereof under this section shall not revive or validate any lapsed or invalid franchise, or enlarge or add to the powers and privileges contained in the grant of any franchise or waive any forfeiture. No such public utility shall directly or indirectly purchase, acquire, or become the owner of any of the property, stock or bonds of any other public utility authorized to engage, or engaged in the same or a similar business, or operating or purporting to operate under a franchise from the same or any other municipality or under an indeterminate permit unless authorized so to do by the commission. Nothing herein contained shall prevent the holding of stock heretofore lawfully acquired or pro-

hibit, upon the surrender or exchange of said stock pursuant to a reorganization plan, the purchase, acquisition, taking or holding by the owner of a proportionate amount of the stock of any new corporation organized to take over at foreclosure or other sale, the property of the corporation whose stock has been thus surrendered or exchanged. Every contract by any public utility for the purchase, acquisition, assignment or transfer to it of any of the stock of any other public utility by or through any person, partnership or corporation without the approval of the commission shall be void and of no effect and no such transfer or assignment of such stock upon the books of the corporation pursuant to any such contract shall be effective for any purpose." (Our emphasis.)

Appellees contend, based upon the emphasized language at the beginning of this section but without reference to the remainder of the section, that all agreements entered into by a regulated utility whereby any part of its physical plant is leased to another are subject to prior Commission approval, and that pole attachment agreements are therefore regulable.[11] Upon reading this section in its entirety, as we are bound to do, we disagree.

We interpret this statutory provision to provide, among other things, assurance that Commission approval is to be gained before a utility may be operated or controlled by any person other than that person who is licensed or permitted to do so. The section does not require Commission approval of incidental leases of utility property when operation of the utility is to remain in the control of the utility-lessor. The section refers to the lease, etc., of a utility's "franchise, works, or system," which we interpret to encompass the lease of an entire operational unit of a utility. It does not refer to the lease of a divisible part of a utility's works which is to be devoted to a use unrelated to the purpose in which the utility is

engaged. This scheme is reflective of the legislature's proper concern that public utility service will be provided by the entity authorized by the Commission to provide that service; consequently, the Commission must approve any arrangement whereby the control and operation of a utility service is sought to be transferred to a person other than that person previously authorized. This section is related to the requirements that before a utility may commence operation it must obtain a certificate of convenience and necessity, and otherwise receive permission from the Commission, thereby ensuring the provision of reasonably adequate utility services to the public.

B. *Rate-making authority of the Commission*

Another remedial section of the Act is cited by Appellees as providing statutory authority for Commission regulation of pole attachments. Ind. Code 8–1–2–68 provides:

"Whenever, upon an investigation, the commission shall find any rates, tolls, charges, schedules or joint rate or rates, to be unjust, unreasonable, insufficient or unjustly discriminatory, or to be preferential or otherwise in violation of any of the provisions of this act, the commission shall determine, and by order fix just and reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise in violation of any of the provisions of this act."

Appellees contend that under this section the amounts charged by utilities for the accommodation of the attachments must be just and reasonable, sufficient, non-discriminatory, and non-preferential. We do not think that this remedial section provides statutory authority for the Commission to assert regulatory jurisdiction over the rates charged by utilities to cable television companies for pole attachments.

---

11. No showing is made that any utility sought Commission approval *prior* to entering into pole attachment agreements. The record shows however, that several Appellee utilities have tendered pole attachment rates to the Tariff Division of the Commission. No action thereon has been taken by the Commission.

The ultimate expression of the Commission's regulatory authority over utility charges is contained in Ind. Code 8–1–2–4, which provides in part:

"Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility *for any service rendered or to be rendered* either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." (Emphasis added.)

█ Consideration of whether this section empowers the Commission to regulate pole attachments requires the determination of whether, within the contemplation of the Act, pole attachment provision is a "service" rendered by a regulated utility. In fact, the determinative issue in this case is whether pole attachment provision is a "service" within the contemplation of the Act. "Service" is defined at Ind. Code 8–1–2–1:

"The term 'service' is used in this act in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public."

Since this definition is no model of statutory draftsmanship, we find it helpful in our analysis to dissect the definition. Upon so doing, we discover three categories of "service" included therein:

(1) The use or accommodation afforded consumers or patrons;

(2) Any product or commodity furnished by the utility; or

(3) The plant, equipment, apparatus, appliances, property, and facility employed by the utility

(a) in performing any service, or

(b) in furnishing any product or commodity *and* devoted

(a) to the purposes in which such utility is engaged *and*

(b) *to the use and accommodation of the public.*

The first type of "service" clearly does not embrace the utility activity here at issue, as pole attachment provision is not a "use or accommodation afforded consumers or patrons." The second type of "service" does not apply, since pole attachment provision does not possess the characteristics of products or commodities. Appellees do not contend that pole attachment provision is a utility service under these segments of the definition of "service" in Ind. Code 8–1–2–1.

It is contended by Appellees that pole attachment provision is a "service" of the variety established by the third subdivision of the definition, that concerning the uses made of a utility's physical components. We disagree. The employment of the utility's plant, equipment, apparatus, appliances, property, and facility, in order to constitute a regulable "service," must be devoted by the terms of the statute to "the purposes in which such utility is engaged *and* to the use and accommodation of the public." (Emphasis added) We do not dispute that utility poles are properly included within the set of physical components with which this category of "service" is concerned. However, the employment of utility poles in the suspension of coaxial cables for the transmission of television signals is not a use devoted to the purposes in which electric and telephone utilities are engaged. Simply put, electric utilities are engaged in the production, transmission, and delivery of electric energy; telephone companies are primarily engaged in the provision of telephonic communications systems. And, the employment of utility poles for the suspension of television cables is not a use devoted to the use and accommodation of the public. The devotion is, rather, to the use and accommodation of the cable television industry. Whereas members of the public may benefit indirectly by this use of utility

poles, if they choose to subscribe to cable television service, we do not think that such ancillary employment of utility equipment is, in the contemplation of the legislature, a "service." Neither qualification regarding the devotion to which the employment of the equipment is to be directed is met. We conclude that the provision of pole space by a regulated utility to cable television companies for the suspension of coaxial cables to transmit television signals is not a "service" within the meaning of the Act.

Other statutory definitions of the term "service" in utility legislation support our interpretation that "service," the charges for which are regulable by the Commission, is limited to those activities necessary in the production and delivery of the product the utilities are created to supply.

Ind. Code 8–1–2–88(a)(1) of the Act defines "telephone service" as,

"... that service provided by a public utility, as defined in this chapter [IND. CODE 8–1–2–1—8–1–2–120] whereby the transmission of intelligence between two [2] or more points within a single territorial area through the use of electricity is the principle intended use thereof and includes all telephone lines, facilities or systems used in the rendition of such service."

In the Rural Electric Membership Corporation (REMC) Act, Ind. Code 8–1–13–3(m) defines "service" as,

"... the furnishing of [electrical] energy, and the rendering of engineering, financial, accounting or educational services incidental to the production, transmission, or use of energy...." (Emphasis added.)

Ind. Code 8–1–13–17 requires REMC's to furnish reasonably adequate services and facilities, and charges for services are to be nondiscriminatory, reasonable, and just. And, Ind. Code 8–1–13–18 states:

"Any corporation organized or admitted to do business in this state under this act shall be subject to the jurisdiction of the public service commission for the purpose of fixing rates to be charged to patrons of the corporation for energy,

and for this purpose the public service commission is given jurisdiction to proceed in the same manner and with the same power as provided by the 'Public Service Commission Act.' utilities."

The Rural Telephone Cooperative Act (Ind.Code 8–1–17–1, et seq.) contains similar definitions. Ind.Code 8–1–17–3(c) and (d) states:

"(c) Telephone service shall mean any service whereby voice communication between two (2) or more persons through the use of electricity is the principal intended use thereof and shall include all telephone lines, facilities or systems used in the rendition of such service.

(d) 'Service' or 'services,' when not accompanied by the word 'telephone,' shall mean construction, engineering, financial, accounting or educational, services incidental to telephone service."

Ind. Code 8–1–17–21(b) states:

"Each local cooperative corporation shall be subject to the jurisdiction of the [public service] commission for the purpose of fixing rates to be charged to patrons of such cooperative corporation for telephone service, and for such purpose the commission is given jurisdiction to proceed in the same manner and with like power as is provided by the 'Public Service Commission Act' in the case of public utilities." (Emphasis added.)

See also, Ind. Code 8–1–17–13(l) and (m).

"Gas distribution service" is defined in the Act as "the furnishing or sale of gas directly to any consumer within the state of Indiana for his or its domestic, commercial or industrial use." Ind. Code 8–1–2–87. Also, "sewage disposal service" means any public service whereby waste is collected, treated, purified and disposed of. Ind. Code 8–1–2–89(a)(1).

We have set forth at length these statutory provisions because we are of the opinion they evince the legislative intent that Commission regulation of rates or charges is limited to rates or charges assessed for the provision of the end product or service the utility was created to provide, that is,

electricity by the electric utilities, and voice communication services by the telephone utilities. Appellees have not cited, and we have not found, any instance where revenue-producing activity by a utility that is unrelated and ancillary to the purposes in which the utility is engaged is subject to Commission regulation.

This exhausts our discussion of the statutory sections cited by Appellees in defense of the Commission's action in asserting its authority to prospectively regulate pole attachment agreements. In our review of the Act we have discovered no grant of authority for the Commission to have asserted the contested jurisdiction. We conclude that the Commission has exceeded its statutory authority.

We do not find it necessary to consider whether the Commission erred in certifying to the FCC its authority to consider the interests of the subscribers of cable television services as well as the interests of consumers of regulated utility services. Having determined that the Commission erred as a matter of law in asserting its authority to prospectively regulate pole attachment agreements, the question of whose interests the Commission would consider in regulating those matters does not arise.

While we need not go beyond the Act itself in resolving the issue presented on this review, additional arguments that lack a statutory foundation have been raised. We shall consider these briefly.

The parties cite cases from other jurisdictions, rendered before and after the congressional enactment of the Communications Act Amendments of 1978, that have considered the issue of state regulation of pole attachment agreements. These cases, appropriately, were decided upon the application of the particular state's public utility legislation; consequently, the jurisdictions are divided on the question. For example, state regulatory commission authority was recognized in *Cable Television Company of Illinois v. Illinois Commerce Commission*, (1980) 82 Ill.App.3d 814, 38 Ill.Dec. 199, 403 N.E.2d 287, and *In re General Telephone Company of Upstate New York, Inc. v. Public Service Commission of the State of New York*, (1978) 63 A.D.2d 93, 406 N.Y. S.2d 909.[12] State authority over pole attachments was denied in *Teleprompter Corporation v. Hawkins*, (1980) Fla., 384 So.2d 648.

■ In support of its assertion of regulatory authority over pole attachments, the Commission cites 1965 Op.Ind. Att'y Gen. No. 75, which concludes, at p. 418, "Telephone and telegraph companies may, *subject to [Commission] approval,* enter into lease agreements for their transmission equipment to CATV companies." [13] (Our emphasis.) It is clear that the official opinions of the Attorney General are of no precedential effect and are not judicially binding. *Hilligoss v. LaDow*, (1977) Ind. App., 368 N.E.2d 1365; *State Board of Tax Commissioners v. Methodist Home for the Aged of the Indiana Conference of the Methodist Church, Inc.*, (1968) 143 Ind.App. 419, 241 N.E.2d 84. Nonetheless, we note that in support of the proposition advanced,[14] the Attorney General cited two inapposite sections of the Act.[15] The cited portion of Ind. Code 8–1–2–5(a) concerns the duty, in certain circumstances, of a public utility to permit another public utility or municipality owning or operating a public utility to use the former's equipment. All

---

12. Shortly after *General Telephone* was handed down, the New York legislature amended its Public Service Law to expressly endow its Public Service Commission with authority to prescribe just and reasonable rates, terms and conditions for attachments to utility poles and the use of utility ducts, trenches and conduits. Section 119–a Pub.Serv.Law; 1978 N.Y. Laws ch. 703. The criteria for the determination of just and reasonable rates thereunder is patterned closely after the federal formula contained in 47 U.S.C.A. § 224(d), *supra.*

13. At oral argument, the deputy Attorney General relied almost exclusively upon this document in support of the Commission's position.

14. The Attorney General also concluded that telephone companies may not discriminate in the provision of pole attachments.

15. References are to the current codification in the Indiana Code.

parties concede, and we agree, that CATV is not a public utility or a municipality owning or operating a public utility. Ind. Code 8–1–2–5(b) concerns the duty of a telephone utility to permit physical connections on its lines to be made by another telephone utility in certain circumstances. *See, Indiana Telephone Corporation v. Indiana Bell Telephone Company, Inc.*, (1976) 171 Ind.App. 616, 358 N.E.2d 218. CATV is manifestly not a telephone utility, and this subsection is inapplicable. Also cited is Ind. Code 8–1–2–83, which we have determined above not to apply to pole attachments. We therefore do not find the conclusions reached by the Attorney General to be supportive of the Commission's position.

There is no showing that public utilities may be compelled to provide pole attachments to cable television companies.[16] Of course, that question is not before us today and we need not reach it. Compulsory provision thus absent, there is no reason that a utility electing to engage in pole attachment arrangements may not contract for such terms and conditions as would provide compensation for all additional costs incurred and assure that safety and adequate provision of service to its subscribers is not impaired.[17] Of course the charges made for pole attachment provision would be subject to review by the FCC, 47 U.S.C.A. § 224(c), *supra.* The federal formula for the determination of just and reasonable charges takes into account expenses attributable to cable. It would be far too speculative at this point for the Commission to assume regulatory authority on the basis that the federal guidelines are too low.

The business of regulating public utilities is a legislative, rather than judicial, function. Many of the points raised by Appellees in support of the Commission's position address matters of policy appropriate to legislative attention. In a word, this is a matter for the legislature. The Act as it stands does not provide for such regulation, and we are constrained to limit the Commission to only such authority as has been conferred thereby. The jurisdiction of the Commission over a public utility's poles is concerned only with their use in performing a regulated public service. In the event that pole attachments interfere with the efficient provision of such services, threaten the safety of the public, or impose upon utilities additional expenses not recovered from the cable companies (and in effect, force utility subscribers to subsidize that industry), provision is made for Commission intervention. Ind. Code 8–1–2–68, 8–1–2–69, *supra.* However, in the instant case Commission intervention was not achieved by the employment of the procedures outlined in those sections of the Act. The Commission exceeded its authority in undertaking to prospectively regulate pole attachment agreements.

This cause is reversed and remanded with instructions to the Commission to withdraw the certification of authority previously sent to the FCC and to proceed in all other respects in a manner consistent with the views expressed in this opinion.

Reversed and remanded.

GARRARD (participating by designation) and YOUNG (participating by designation), JJ., concur.

---

16. *But see* 1965 Op. Att'y Gen. 75, *supra*, at p. 420, expressing a contrary view.

17. We cannot help but observe the anomalous posture assumed by Appellee utilities in asking to be regulated in this aspect of their operations.