INDIANA BELL TELEPHONE COMPANY, INCORPORATED d/b/a Ameritech Indiana; Ameritech Corporation; and SBC Communications Inc., Appellants (Respondents below),

v.

INDIANA UTILITY REGULATORY COMMISSION; Office of Utility Consumer Counselor; AT&T Communications of Indiana, Inc.; Consolidated City of Indianapolis and Marion County, Indiana; Indiana Cable Telecommunications Inc.; Time Warner Communications of Indiana, Inc.; Sprint Communications Company L.P., and United Telephone Company of Indiana, Inc. d/b/a Sprint; Indiana Payphone Association; KMC Telecom II, Inc.; Communications Workers of America, Inc.; Citizens Action Coalition of Indiana, Inc.; American Association of Retired Persons, Inc.; and United Senior Action of Indiana, Inc., Appellees (Statutory Parties and Intervenors Below).

No. 93S02–9906–EX–350.

Supreme Court of Indiana.

July 30, 1999.

352

Sue E. Stemen, Teresa E. Morton, Stanley C. Fickle, Daniel W. McGill, Peter J. Rusthoven, Indianapolis, Indiana, Attorneys for Appellant Ameritech Indiana.

Paul K. Mancini, Joseph E. Cosgrove, Jr., San Antonio, Texas, Randolph L. Seger, Robert B. Scott, Indianapolis, Indiana, for Appellant SBC Communications, Inc.

Kay Pashos, Plainfield, Indiana, Robert E. Heidorn, Bryan G. Tabler, Indianapolis, Indiana, Peter L. Hatton, Merrillville, Indiana, George A. Porch, Evansville, Indiana, for Amici Curiae Cinergy Corp., Indiana Energy, Inc., Ipalco Enterprises, Inc., Nisources, Inc., Sigcorp, Inc.

Jeffrey A. Modisett, Attorney General of Indiana, Geoffrey Slaughter, A. Scott Chinn, Cindy M. Lott, Deputy Attorneys General, Indianapolis, Indiana, for Indiana Utility Regulatory Commission.

Anne E. Becker, Keith L. Beall, Robert M. Glennon, Timothy M. Seat, Karol H. Krohn, Indianapolis, Indiana, for Office of Utility Consumer Counselor.

Michael A. Mullett, Indianapolis, Indiana, for American Association of Retired Persons, Inc., Citizens Action Coalition of Indiana, Inc., United Senior Action of Indiana, Inc.

John F. Wickes, Jr., Todd A. Richardson, Indianapolis, Indiana, for Amicus Curiae Indiana Industrial Energy Consumers, Inc.

## ON EMERGENCY PETITION TO TRANSFER

BOEHM, Justice.

This case deals with the jurisdiction of the Indiana Utility Regulatory Commission under Indiana Code § 8–1–2–83(a). This section uses language that contrasts sharply with its counterparts in some other states. It provides that "no public utility, as defined in section 1 of this chapter, shall sell, assign, transfer, lease or encumber its franchise, works, or system ... without approval of the commission." Based on the language of section 83(a), the history of that section and similar legislation, and this Court's and the Commission's existing interpretations of that section, we hold that section 83(a) does not confer Commission jurisdiction over transactions in the outstanding securities of a public utility or its parent.

### Factual and Procedural Background

Ameritech Corporation and SBC Communications, Inc., are two of the "Baby Bells" created by the breakup of AT&T in 1984. On May 11, 1998, they announced their intent to merge. Ameritech is the corporate parent and holding company of Indiana Bell Telephone Company, Inc., which operates approximately 65% of Indiana's local exchange telephone access lines. Ameritech also owns operating telephone companies in Michigan, Wisconsin, Illinois and Ohio. If the transaction is consummated as proposed, Indiana Bell will continue to be wholly owned by Ameritech, but Ameritech will be a wholly-owned subsidiary of SBC. The form of the proposed transaction is a merger of Ameritech with a newly formed wholly-owned subsidiary of SBC whereby Ameritech shareholders would exchange their shares for shares in SBC.

On September 2, 1998, the Indiana Utility Regulatory Commission, on its own motion, opened an investigation of the proposed transaction. The Commission's investigation included a hearing on December 1 & 2, 1998, where SBC, Ameritech and Indiana Bell (together the "appellants") responded to the Commission's questions and presented witnesses. At the close of the hearing, the Commission asked the parties to address the jurisdiction of the Commission to approve the merger under Indiana Code § 8–1–2–83(a). Several intervenors filed briefs with the Commission addressing the jurisdictional issue. These included consumers, industrial customers and current and potential competitors.

On May 5, 1999, the Commission found that section 83(a) required the Commission to review the proposed merger because "a transaction in which at least fifty percent of a public utility's voting capital stock is sold, transferred, etc. necessarily constitutes the sale, transfer, etc. of that public utility's franchise, works, or system." The appellants filed a notice of appeal with the Court of Appeals. This Court granted their subsequent petition for transfer pursuant to Appellate Rule 4(A)(9) and set an expedited briefing schedule.[1]

There is no dispute that the effect of the proposed transaction will be to transfer control of Indiana Bell from Ameritech, its current parent, to SBC. It is equally undisputed that Indiana Bell will do nothing to effect

1. In addition to the Commission, several intervenors in the proceedings before the Commission including the Office of Utility Consumer Counselor (the Counselor), filed briefs in this Court. In addition, the American Association of Retired Persons, Inc., the Citizens Action Coalition of Indiana, Inc., and United Senior Action of Indiana, Inc. (together "intervenors") filed a joint brief.

the transaction. Its ownership—more precisely its indirect ownership—will change, but it will remain the same regulated utility that exists today with the same assets and liabilities, the same customers and suppliers, and the same corporate structure and capitalization. The issue, in simple terms, is whether section 83(a) requires the Commission's approval for a transfer of control of a public utility if the assets of the operating company—in this case Indiana Bell—remain in the operating company and the only things transferred are the outstanding shares of the operating company.[2]

Appellants point out that the Commission has continuing power over Indiana Bell's rates, service levels, etc., regardless of who owns it. They argue that the language of section 83(a) reflects a legislative choice not to regulate transactions at the shareholder level and a legislative determination that the ongoing jurisdiction of the Commission is sufficient to protect the public. The proponents of Commission jurisdiction respond that the proposed transaction is the functional equivalent of a transfer of all of Indiana Bell's assets to SBC and should be subject to Commission approval. They contend that a shift in beneficial ownership at the shareholder level should be sufficient to trigger the requirement for prior approval to prevent utilities from falling into the hands of owners who are potential threats to adequate service. They argue further that ongoing jurisdiction over Indiana Bell's affairs is a less effective tool than the power to disapprove the transaction altogether in carrying out the Commission's mission to assure protection of customers' interests.

For the reasons explained below, we conclude that the legislature has made the choice to rely on the Commission's ongoing powers to regulate utilities directly and has expressly refused to give the Commission the jurisdiction it claims over transactions at the shareholder level.

### Standard of Review

■ The Commission's jurisdiction under Indiana Code § 8–1–2–83(a) is a legal question this Court reviews *de novo*. *See Public Service Comm'n of Indiana v. City of Indianapolis*, 235 Ind. 70, 82–83, 131 N.E.2d 308, 312–13 (1956).

### I. Jurisdiction over Transfers by a Shareholder

■ There is no dispute that the Commission's jurisdiction is defined by statute and that section 83(a) is the only basis for Commission jurisdiction to approve. or disapprove this transaction.[3]

### A. *The Language of the Statute*

■ The first and often the last step in any effort to interpret a piece of legislation is to examine the language of the statute. *See Collier v. Collier*, 702 N.E.2d 351, 354 (Ind. 1998); *Indiana Dep't of State Revenue v. Horizon Bancorp*, 644 N.E.2d 870, 872 (1994) ("nothing may be read into a statute which is not within the manifest intention of the legislature" as ascertained from "the plain and obvious meaning" of the words of the statute); *see also In re Northwestern Indiana Tel. Co.*, 201 Ind. 667, 676, 171 N.E. 65, 68 (1930) (the Commission must "determine the question of its jurisdiction . . . by giving [the

2. This transaction involves an exchange of Ameritech stock for shares in SBC. As a result the shares exchanged are shares of a parent of the operating company, not the operating company itself. This makes no difference for purposes of the statutory analysis and we refer for simplicity to transfers of shares of the operating company.

3. The Commission, as an administrative agency, "derives its power and authority solely from the statute, and unless a grant of power and authority can be found in the statute it must be concluded that there is none." *General Tel. Co. of Indiana, Inc. v. Public Serv. Comm'n of Indiana*, 238 Ind. 646, 651, 154 N.E.2d 372, 373 (1958)

(quoting *Chicago & E.I.R. Co. v. Public Serv. Comm'n of Indiana*, 221 Ind. 592, 594, 49 N.E.2d 341, 341 (1943)). Notwithstanding its purpose "to insure that public utilities provide constant, reliable, and efficient service to [their] customers, the citizens of this state," *Office of Utility Consumer Counselor v. Public Serv. Co. of Indiana, Inc.*, 463 N.E.2d 499, 503 (Ind.Ct.App. 1984), the Commission itself recognizes its jurisdictional limits: "this Commission . . . has only such jurisdiction as is specifically delegated by statute." *In re Madison Light & Power Co.*, 1924C Pub. Util. Rep. (PUR) 517, 519 (IPSC 1924).

statutes] what is known as a 'practical construction' ").

On its face this section prohibits only actions by a "public utility" that effect a "transfer" etc., of the utility's "franchise, works, or system." Given this syntax, the appellants contend that section 83(a) does not apply to transfers of outstanding stock of a public utility for two reasons. First, the appellants argue that even if control of the utility is affected, Commission approval is required only if a "public utility," which is a defined term, proposes to transfer something. Second, they contend that the transaction does not transfer the "franchise, works or system" of the public utility, all of which remain, as before, in Indiana Bell. If, as here, the proposed transaction would effect a transfer of the entire utility, these two linguistic points are two sides of the same coin. Because ownership of the "franchise, works, or system" of a utility rests in the utility, if the statute is read literally, it takes action by the utility to transfer them.

### 1. Who is a "Public Utility"

■ "Public utility" is defined by statute as an entity "that may own, operate, manage, or control any plant or equipment within the state." IND.CODE § 8–1–2–1 (1998). The appellants argue that the shareholders of the public utility's holding company do not fall within this defined term. If we were writing on a clean slate, inclusion of "control" in this definition might be fairly interpreted to include among "public utility" anyone who has control of a public utility by ownership of voting stock or otherwise. A very sizeable body of precedent points in the other direction however, and finding holding companies to be public utilities would effect a major change in relatively settled doctrine.

■ The difference between legislative and judicial or administrative resolution of the issue is enormous. If the law is changed by statute, it will be done prospectively with no effect on past transactions. On the other hand, it is difficult to see a principled decision finding Ameritech to be a public utility for purposes of section 83(a) that would not also call into question an array of past transactions by it and many other holding compa-

nies. Although the Commission in this case expressly refrained from expressing a view on the question of whether Ameritech was itself a "public utility," such a holding would have very significant potential consequences. Section 83(a) itself would have been violated by several well-publicized acquisitions by other holding companies that have proceeded without Commission approval, some quite recently. The sale of securities by a public utility requires Commission approval under section 79. Securities issued without that approval are "void" according to section 83(d).

If Ameritech and the many other holding companies owning Indiana utilities are themselves public utilities, a vast number of very public violations of these sections have been committed over the years in full view of the Commission, the courts and the General Assembly. The deafening silence that attended these events can only confirm the common understanding that holding companies are not themselves public utilities as defined by statute. Whether they should be subject to a higher degree of regulation is of course another matter, but it is for consideration by the General Assembly, not this Court or the Commission.

Presumably recognizing this practical problem in finding Ameritech to be a public utility, the Commission expressly reserved its view on the point but found jurisdiction over the transaction based on the undisputed fact that the proposed transaction would shift control of Indiana Bell to SBC from Ameritech. One problem with this view, which certainly enjoys some support in policy, is that the statute does not support it. As a matter of grammar, the prohibition of section 83(a) operates on public utilities, not anyone else. For the reasons explained below, we conclude that the section means what it says, and no more.

### 2. What is the "Franchise, Works, or System" of a Utility

■ A second statutory hurdle is equally insurmountable. The appellants point out that because section 83(a) requires a transaction involving a public utility's "franchise,

works, or system," a transfer of outstanding shares of stock in a utility does not fall within the Commission's jurisdiction. Six years ago we agreed with this view of section 83(a) in *Office of Utility Consumer Counselor v. Public Service Company of Indiana, Inc.*, 608 N.E.2d 1362 (Ind.1993). We still do.

The Commission and the Counselor argue that this case is distinguishable from PSI's creation of a holding company because control of Indiana Bell will shift from Ameritech to SBC. They correctly observe that in *PSI* the transaction included creation of a newly formed holding company in which the shareholders of the operating company exchanged their shares for shares of the holding company. After this transaction the same shareholders, the same board of directors, and the same management were in control of the utility. This is another way of saying, in statutory terms, that there was no "sale" or other "transfer." The proposed Ameritech-SBC transaction differs from *PSI* in that respect, but the rationale of our *PSI* ruling did not turn on the absence of a "transfer." Rather, we held that the object of the transfer was not the "franchise, works, or system" of a public utility. Indeed, we specifically observed that something was being transferred, but the transfer did not require Commission approval: "[t]he contemplated exchange for holding company stock does not involve a sale, assignment, transfer, lease or encumbrance of PSI's franchise, works, or system, all of which PSI will continue to own. Only the shares of PSI stock are being transferred." *Id.* at 1364.

The Commission argues that this Court's statement of the issue in *PSI* as "whether the stock exchange between PSI and the holding company constitutes a transfer of control," *id.* at 1363, supports its view that hinges jurisdiction on a "change in control." However, the holding of the case, clearly based on the language of the statute, is that transactions by a public utility's shareholders do not require Commission approval. Accordingly, *PSI*, unless it is to be revisited, governs the resolution of this case and precludes Commission jurisdiction. We believe that the case was correctly decided then, and reaffirm it.

The intervenors argue that sub-section (a) must be read to include transactions in stock because subsections (b) and (d), explicitly relate to stock of a public utility, and the section should be read *in pari materia*, i.e., to accomplish the same general goal. Although we generally agree that statutes must be construed together, we draw the opposite conclusion. The fact that the other subsections explicitly state that they apply to stock of a public utility demonstrates that the General Assembly knows how to say stock when it means stock. The language of this section reinforces the conclusion that the legislature made a conscious choice to exclude transactions in stock from the Commission's section 83(a) jurisdiction. If so, reversing that choice is for the legislature as a fundamental matter of separation of powers among the three branches of our state government.

### B. *The Legislative History of the Act*

The history of section 83(a) confirms that it embodies a specific choice by the legislature not to require approval of shareholder transactions. Indeed, the General Assembly has repeatedly made the conscious decision not to include holding companies in the definition of "public utility." The statute has been on the books since 1913. At the time it was passed and in the ensuing troubled decades, frequent calls were made to regulate public utility holding companies in this state and elsewhere. In 1925, Governor Branch addressed the opening session of the General Assembly and urged legislation to declare all holding companies public utilities and give the Commission investigatory power over holding companies to "find out the true status of affairs and fix a proper valuation for the purpose of making a rate." 1925 JOURNAL OF THE STATE SENATE OF INDIANA, Jan. 8, 1925, p. 11–12. In the 1925 session, a bill was introduced to amend the definition of public utility in section 1 to provide:

> whenever more than fifty per cent of the common stock of any public utility corporation is held, controlled or owned by any other corporation or by any holding company or association of individuals, then such other corporation, holding company or association of individuals shall be

deemed to be a public utility and shall be subject to all the provisions of this act. Senate Bill 18, 74th General Assembly (Ind. 1925). The Senate voted to postpone indefinitely this bill and apparently took no other action on it. 1925 JOURNAL OF THE STATE SENATE OF INDIANA at 178–79. Similar bills were introduced in the 1929 and 1931 sessions, but failed. *See* 1929 JOURNAL OF THE STATE HOUSE OF REPRESENTATIVES OF INDIANA at 448–449; 1931 JOURNAL OF THE STATE SENATE OF INDIANA at 121, 621–22.

Abuse of holding company structures was rampant in the twenties and thirties[4] and ultimately Indiana took steps to subject holding companies to its regulatory scheme. In 1933, the Act was amended to give the Commission power to investigate a public utility's affiliates (those who own 10% or more of a utility's voting capital stock). *See* ACTS OF THE INDIANA GENERAL ASSEMBLY, 1933 ch. 190, § 6 (now codified at IND.CODE § 8–1–2–49 (1998)). In light of the three failed attempts in the preceding six years to include holding companies in the definition of public utility, this addition must be viewed as a compromise that brought holding companies under limited scrutiny of the Commission by providing access to affiliate information, but did not go so far as to subject them to all requirements imposed on a public utility. In short, we agree with appellants that section 49 "reflects a continued legislative choice to use indirect, rather than direct, regulation of holding companies."

### C. *Comparison with other Legislation*

If the General Assembly had elected to regulate public utility holding companies, ample model legislation was available in the form of the Federal Public Utility Holding Company Act of 1935.[5] In addition, some states treat holding companies as public utilities or explicitly require approval of a transfer of a controlling interest in a utility. *See, e.g.*, § 220 ILL. COMP. STAT. 5/7–204 (West 1993) (statute requires commission approval

of "reorganization" of a utility which is defined to include a transaction resulting in change in "the ownership or control of any entity which owns or controls a majority of the voting capital stock of a public utility"); OHIO REV.CODE § 4905.402 (1991) ("no person shall acquire control, directly or indirectly, of a domestic telephone company or a holding company controlling a domestic telephone company" without prior commission approval). As a result both Ohio and Illinois have jurisdiction to approve this transaction today. Indiana is not alone in electing a different approach. Appellants tell us, and no one disputes, that neither Wisconsin nor Michigan asserts that power.

Finally, Indiana has chosen to regulate holding companies in other regulated industries and knows how to write a statute to accomplish that if it is the desired goal. *See, e.g.*, IND.CODE §§ 28–2–14–1 to –19 (1998) (bank holding companies) & *Id.* §§ 27–1–23–1 to –13 (insurance holding companies).

### D. *Commission Interpretation*

Beginning at least in 1924, the Commission held that section 83(a) did not confer jurisdiction over a transaction by an entity that is "not a utility but is a holding company." *In re Madison Light & Power Co.*, 1924C Pub. Util. Rep. (PUR) 517, 519 (IPSC 1924) (no jurisdiction over holding company sale of capital stock); *see also In re Otterbein Tel. Co.*, 1925A Pub. Util. Rep. (PUR) 189, 191 (IPSC 1924). As recently as 1990, the Commission held that it had no jurisdiction under section 83(a) to approve a transfer of a public utility's stock by a shareholder. "We conclude that stock ownership alone is not sufficient to place [a shareholder] within the ambit of public utility regulation." *In re Dalecarlia Utility Corp.*, No. 38827, 1990 Ind. PUC LEXIS 114 at \*4 (IURC Apr. 11, 1990) (rejecting the Counselor's argument that public utility includes shareholders, directors and managers of all public utilities);

---

4. *See generally* ROBERT F. RITCHIE, INTEGRATION OF PUBLIC UTILITY HOLDING COMPANIES 1–15 (1954) (describing the collapse of public utility holding companies assembled by Samuel Insull and others as a "debacle" that "impressed upon the public the need for some sort of regulation to

prevent the recurrence of such financial slaughter," *id.* at 2).

5. 15 U.S.C. §§ 79a to 79z–6 (1994 & Supp. III 1997).

*see also In re MidAmerica Communications Corp.,* No. 39187, 1991 Ind. PUC LEXIS 196 at *2 (IURC June 12, 1991) ("Mere ownership interest in the stock of a utility does not transform an individual or corporation from an investor into a public utility."). .

■ The Counselor points to several recent cases where the Commission has approved transactions involving holding companies. In each case, the public utility and its parent holding company voluntarily sought Commission approval and the question of jurisdiction was neither contested nor litigated by the parties to the transaction. *See, e.g., In re Rochester Tel. Corp.,* No. 40099, 1995 Ind. PUC LEXIS 40 (IURC Feb. 8, 1995); *In re Frontier Corp.,* No. 40205, 1995 Ind., 1995 WL 735627 (IURC July 12, 1995). Parties may seek approval of holding company transactions from the Commission for a variety of reasons, but their voluntary submission to jurisdiction has no bearing on the scope of the Commission's statutory jurisdiction.

The Commission acknowledges that it has long interpreted section 83(a) to preclude jurisdiction over transactions by shareholders or holding companies. It argues that its change in interpretation in this case is required in order to avoid "shipwrecking justice" in light of "the modern economic reality that holding-company transactions ... are the method *du jour* by which control of utilities is transferred." Public utility holding companies are hardly a new phenomenon. If the Commission feels that its regulatory efforts are potentially frustrated by the inability to disapprove shareholder transactions, either by reason of changes in the economy or changes in the desired level of regulation, it must turn to the General Assembly.

■ The Commission and others also argue that the Commission is not bound by its prior rulings, and should be free to correct past errors and respond to new developments. We agree with that general proposition, but it has no application to this case. Commission rulings are relevant here not as binding precedent, but as confirmation of a clear legislative choice. We are not dealing

with a subject the legislature left unaddressed. This is no obscure backwater of the law. The debate over how much and how to regulate public utilities and their holding companies has been a matter of front page concern for decades. The conclusion is inescapable that Indiana's legislature has resolved this issue, and not left it open to court or administrative interpretation. Under these circumstances, neither the Commission nor this Court is free to legislate its own policy.

### E. *Legislative Silence*

■ "A long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 976 (Ind.1998) (quoting *Board of Sch. Trustees v. Marion Teachers Ass'n,* 530 N.E.2d 309, 311 (Ind.Ct.App.1988)). The doctrine of legislative acquiescence is less relevant where the issue is one the legislature has addressed, rather than a need to fill a gap in the statute or interpret an ambiguity. Nonetheless, we assume that if the General Assembly were dissatisfied with the Commission's long-standing interpretation of section 83(a) or this Court's decision in *PSI,* it would have amended the Act to include holding companies in the definition of "public utility," or to regulate transactions in control of a utility regardless of the parties to the transaction. It can, of course, still pursue that course.

The Commission argues that the appellants cannot rely on legislative acquiescence without a showing of reliance. *See Citizens Action Coalition of Indiana v. Northern Indiana Pub. Serv. Co.,* 485 N.E.2d 610, 616 (Ind.1985) ("the doctrine of legislative acquiescence is an estoppel doctrine designed to protect those who rely on a long standing administrative interpretation"). Even if the appellants in this case are not able to show that they have detrimentally relied on the Commission's previous interpretation,[6] a

**6.** The Commission has agreed to complete its

investigation and decide on approval promptly to

holding from this Court that subjects this transaction to Commission approval would have significant implications for other transactions that have relied on existing law. And, as already noted, the view that holding companies are public utilities would have dramatic consequences for Ameritech and a multitude of other corporations and their shareholders.

### F. *Other Authorities*

In support of its "functional" approach to jurisdiction, the Commission points to the Court of Appeals' decision in *Illinois–Indiana Cable Television Association Inc. v. Public Service Commission of Indiana,* 427 N.E.2d 1100 (Ind.Ct.App.1981). In *Illinois–Indiana Cable,* the Court of Appeals held that the Commission did not have jurisdiction under section 83(a) to set rates for cable television pole attachments to existing telephone and electric facilities. The court went on to explain that the utilities' "incidental lease" of its property did not authorize Commission jurisdiction. This was a holding that by hanging a few cables on telephone poles there was no "lease" of the essential assets of the utility and presumably also that what was surrendered was not the "franchise, works or system." Neither point addresses at all the issue of who must be the transferror or whether voting control of the utility could constitute its "franchise, works, or system."

In the course of its opinion, the Court of Appeals stated that "Commission approval is to be gained before a utility may be operated or controlled by any person other than that person who is licensed or permitted to do so." *Id.* at 1108. The Commission argues that this statement supports its finding of jurisdiction in this case over a transaction that will result in a "change in control." We disagree. On the facts before it, the Court of Appeals quite properly held that section 83(a) did not confer jurisdiction where the utility leases a "divisible part of a utility's works." "Control" was directed at the level of authority over the utility's assets being transferred to determine whether there was

a "lease" of the asset at all. However, the transaction in question clearly involved a public utility "selling, assigning, transferring, leasing, or encumbering" its own assets. Accordingly, the opinion has no bearing on a transfer by shareholders of the public utility's holding company. Finally, even if it did speak to the transfer of control of a utility, *Illinois–Indiana Cable* is a Court of Appeals' opinion superseded by the more recent opinion of this Court in *PSI.*

The Counselor also points, as it did in *PSI,* to the Federal Energy Regulatory Commission's holding in *In re Central Vermont Public Service Corporation,* that it had jurisdiction over the creation of a holding company by sale of the utility's capital stock under the Federal Power Act. 84 PUR4th 213, 1987 WL 257899 (F.E.R.C.1987). In *PSI* we disagreed with that ruling, at least as it applied to Indiana's statute. We still do. The FPA provides: "No public utility shall sell, lease or otherwise dispose of the whole of its facilities ... without first having secured an order of the Commission authorizing it to do so." 16 U.S.C. § 824(b) (1994 & Supp. III 1997). FERC reasoned that:

> [a]lthough the current stockholders of the public utility will own stock in the holding company after the reorganization is completed they will no longer have a proprietary interest in, or direct control over, the jurisdictional facilities. The substance of the transaction, therefore, is a "disposition" of facilities via the transfer of all direct control.

*Id.* at 215–16. Because FERC was construing a statute that is not identical to section 83(a), its decision is distinguishable on that ground alone. More importantly, there are difficulties in the reasoning of *Central Vermont* that undermine the Counselor's suggestion that we follow FERC's "change in control" analysis to determine jurisdiction. FERC's view that the shareholders will lose "direct control over the jurisdictional facilities" suggests that the stockholders had direct control before the formation of the

avoid delaying the transaction beyond the time required to secure other governmental approval. If the transaction were disapproved, Ameritech and SBC would have a powerful argument that

their structuring their transaction as proposed is sufficient reliance. The point is moot in view of our holding today.

**360**

holding company. This is a fundamentally illogical point. The officers and directors of the utility had direct control over the assets of the utility just as they had after the holding company was created. And the shareholders had the ability to vote the directors out before and after the creation of the holding company. Whether one views the shareholders, the officers or the directors as in "control," no change in any of these is effected by the creation of a holding company. Accordingly, we do not find persuasive FERC's analysis of its jurisdiction under the FPA as applied to this Court's interpretation of section 83(a).

In sum, the language of section 83(a), the Commission's long-standing interpretation and this Court's holding in *PSI* preclude Commission jurisdiction over a transaction by a public utility's holding company.

## II. Public Policy

The Commission and others make several compelling policy arguments, all of which boil down to the need for pre-merger investigation and approval by the Commission to protect the consumers of Indiana. As the Counselor puts it:

> [b]ecause of the potential for abuse by public utility holding companies, ratepayers require and deserve the Commission's ability to investigate and where appropriate, exercise its authority to protect customers when proposed mergers between public utility holding companies would result in transfer of control over their regulated Indiana public utility subsidiaries.

It may well be that it is more efficient or effective in protecting the interests of the citizens of our state for the Commission to have power to disapprove a shift in control of a utility, rather than simply power to regulate the utility after its ownership is transferred. However, those arguments are for the General Assembly, not this Court or the Commission.

## Conclusion

The Commission's order is vacated for lack of jurisdiction.

DICKSON and SELBY, JJ., concur.

SHEPARD, C.J., dissents with opinion.

SULLIVAN, J., not participating.

SHEPARD, Chief Justice, dissenting.

Six years ago, Justice DeBruler outlined his legal analysis of section 83; he concluded the buying and selling of utilities is within the jurisdiction of the Indiana Utility Regulatory Commission. *Office of Utility Consumer Counselor v. Public Service Company of Indiana, Inc.*, 608 N.E.2d 1362, 1364 (Ind. 1993) (DeBruler, J., dissenting).

I thought Justice DeBruler was right then, and I adhere to those views today. I would affirm the order of the Commission asserting its jurisdiction.

I find some modest solace in the acknowledgement of my colleagues that the policy arguments favoring supervision of business combinations such as the one before us today are "compelling." Slip. opin. at 19. As a state of six million people, Indiana is a substantial economic enterprise. Still, we cannot hope to thrive in the modern global economy unless our state acts with force and foresight at every opportunity. In the field of banking, Indiana missed the chance to be Ohio and largely became a branch office. We now seem at risk of dissipating our long-standing national advantage in the insurance industry. The executive department has decided to stand its ground in the field of telecommunications. I regret that the judiciary has let it slip away.