**UNITED STATES GYPSUM, INC., et al., Appellants,**

v.

**INDIANA GAS COMPANY, INC., et al., Appellees.**

No. 93A02–9710–EX–667.

Court of Appeals of Indiana.

Oct. 8, 1998.

John F. Wickes, Jr., Todd A. Richardson, Pamela H. Sherwood, Lewis & Kappes, Kirby Mullen, Michael A. Mullett, Mullett & Associates, Anne E. Becker, Utility Consumer Counselor, Christopher C. Earle, Assistant Deputy Consumer Counselor, Indianapolis, Indiana, Attorneys for Appellants.

Ronald E. Christian, Robert E. Heidorn, Indiana Gas Company, Inc., Daniel W. McGill, Stanley C. Fickle, Barnes & Thornburg, Wayne C. Turner, Matthew W. Foster, McTurnan & Turner, Steven M. Sherman, ProLiance Energy, Harry V. Huffman, Citizens Gas & Coke Utility, Michael B. Cra-

craft, Philip B. McKiernan, Hackman McClarnon Hulett & Cracraft, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

The Petitioners–Appellants in this case fall into three distinct categories. The first category shall be designated as the "Transportation Customers," and it consists of United States Gypsum, Inc., General Motors Corporation, Reid Hospital & Healthcare Services, Belden Wire & Cable Company, Eli Lilly & Company, Knauf Fiber Glass GmbH, Dana Corporation, Aluminum Company of America, Hayes Wheels International, Thomson Consumer Electronics, and Visy Paper Inc. The second category shall be designated as the "Residential Customers," and it consists of Jerome E. Polk, Grant Smith, Julia L. Vaughn, Mark S. Bailey, William G. Simmons, Timothy E. Peterson, and Robert V. Benge. This category also includes the Citizens Action Coalition of Indiana, Inc. (the "Coalition") and the United Senior Action, Inc. The third category shall be designated as the "OUCC," and it consists of the Indiana Office of Utility Consumer Counselor. When possible, the three categories shall be designated collectively as the "Appellants."

The Appellants appeal the decision of the Indiana Utility Regulatory Commission (the "Commission") to deny their petition filed pursuant to Ind.Code 8–1–2–54 seeking "Disapproval Of Joint Venture To Provide Gas Supply Management and Gas Marketing Services, Disapproval Of Contracts and Agreements Between The Utilities And The Joint Venture, Disapproval of the Assignment Of Utility Assets To The Joint Venture, And A Determination That The Joint Venture Is Impressed With A Public Interest and Is Subject To Regulation As A Public Utility." The petition was filed to achieve the disapproval of an agreement (the "agreement") between Respondents–Appellees Indiana Gas Company, Inc. ("Indiana Gas"), the Board of

Directors for Utilities of the Department of Public Utilities of the City of Indianapolis, as Successor Trustee of a Public Charitable Trust, d/b/a Citizens Gas & Coke Utility ("Citizens Gas"), and ProLiance Energy, LLC ("ProLiance").

We reverse and remand.

### ISSUES

The following issue is dispositive: whether the Commission lacked the authority to deny the Appellant's petition when Indiana Gas and Citizens Gas failed to follow the dictates of the Alternative Utility Regulation Statute.

### FACTS AND PROCEDURAL HISTORY

Indiana Gas and Citizens Gas have territories in Indiana within which they distribute natural gas through pipeline systems they own and operate subject to the Commission's regulation. Gas utilities of this type are commonly referred to as local distribution companies or "LDCs." LDCs transport gas through their intrastate pipeline systems to retail customers, subject to the Commission's jurisdiction. Interstate pipelines transport gas from producing areas to interconnection delivery points on LDC systems (the LDCs' "city gates"), and are subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC"). Gas is brought to the utilities from Oklahoma, Kansas and Texas, primarily by the Panhandle, Texas Gas, and ANR interstate pipelines.

Historically, interstate pipelines have acquired gas at the wellhead from gas producers at FERC-regulated prices, and then sold to LDCs both the wholesale gas and its interstate transportation as a single ("bundled") product, also at FERC-regulated prices. LDCs then sold both the gas and its local transportation (also called "distribution") to retail customers as a single product. The price of such product and local transportation is regulated by the Commission.

Congress began restructuring the natural gas industry with the Natural Gas Policy Act of 1978, which phased out price regulation of gas sold to the interstate pipelines. FERC continued the restructuring through a series of orders in the 1980s which required the

pipelines to sell their transportation as a stand-alone product ("unbundled"), thereby creating a competitive market for the gas itself. A 1992 FERC order carried unbundling further and also developed a complex secondary market for pipeline transportation, allowing purchasers to resell that service (called "capacity release").

The competitive market for gas and the secondary market for pipeline transportation have led to the development of large interstate "marketers." These marketers sell gas and interstate transportation not only to LDCs but also directly to end users. Large gas customers like the Transportation Customers now purchase much of their gas directly from interstate marketers and gas producers, and purchase transportation services within a local territory from LDCs. Furthermore, in response to the changing and increasingly complex interstate gas market, many LDCs have contracted with interstate marketers to provide their gas supply.

In light of the ongoing gas industry changes, affiliates of Indiana Gas and Citizens Gas agreed in 1996 to form an alliance for purposes of procuring gas supply. ProLiance was formed as a separate entity, and it entered into supply agreements with Indiana Gas and Citizens Gas. Under the supply agreements, ProLiance delivers the entire gas supply requirements to the city gates of Indiana Gas and Citizens Gas. In doing so, it supplies both the gas and the interstate transportation. Initially, ProLiance will provide this service by administering Indiana Gas' and Citizens Gas' existing supply contracts for gas and transportation. As these supply contracts expire, ProLiance will be responsible for negotiating new ones. In addition, ProLiance will be responsible for preparing and submitting proposed supply plans and scheduling gas deliveries pursuant to final supply plans approved by Indiana Gas and Citizens Gas. It is intended that Indiana Gas and Citizens Gas will maintain control over their gas supply in a competitive market through the enhanced bargaining power of ProLiance.

The Appellants filed a petition with the Commission alleging that the supply agreements between Indiana Gas, Citizens Gas, and ProLiance were improper and should be disapproved. The Commission found that the supply agreements were in the public interest under Ind.Code 8–1–2–42, and it refused to disapprove the agreements. However, the Commission did express its intention to further review the agreements in extended gas cost adjustment ("GCA") hearings. The Appellants now appeal the Commission's refusal to disapprove the agreements.

### DISCUSSION AND DECISION

The Appellants contend the Commission lacked the authority to approve the supply agreements because Indiana Gas and Citizens Gas (hereinafter referred to as the "Utilities") failed to comply with the Alternative Utility Regulation Act (the "Act"). The Appellants argue that compliance with the Act was necessary because, *inter alia*, the portion of the agreement dealing with the cost of gas sold by ProLiance to the Utilities constituted "index pricing" allowable only under the Act.

In addressing the issue of the Commission's authority, we are guided by the language of various sections of the Act. The purpose of the Act is found in its first section, which provides:

(1) That the provision of safe, adequate, efficient, and economical retail energy service is a continuing goal of the commission in the exercise of its jurisdiction.

(2) That competition is increasing in the provision of energy services in Indiana and the United States.

(3) That traditional commission regulatory policies and practices, and certain existing statutes are not adequately designed to deal with an increasingly competitive environment for energy services and that alternatives to traditional policies and practices may be less costly.

(4) That an environment in which Indiana consumers will have available state-of-the-art energy services at economical and reasonable cost will be furthered by flexibility in the regulation of energy services.

(5) That flexibility in the regulation of energy services providers is essential to the

well-being of the state, its economy, and its citizens.

(6) That the public interest requires the commission to be authorized to issue orders and to formulate and adopt rules and policies that will permit the commission in the exercise of its expertise to flexibly regulate and control the provision of energy services to the public in an increasingly competitive environment, giving due regard to the interests of consumers and the public, and to the continued availability of safe, adequate, efficient, and economical service.

Ind.Code 8–1–2.5–1. The Act allows an energy utility to deviate from traditional regulation by "voluntarily submit[ting] a verified petition to the commission stating the energy utility's election to become subject to [Sections 5 and 6 of the Act]." [1]

An energy utility may petition the Commission to "adopt alternative regulatory practices, procedures, and mechanisms" that are "in the public interest" and that "enhance or maintain the value of the energy utility's retail energy services or property." Ind. Code 8–1–2.5–6(a)(1). It may also petition the Commission to "[e]stablish rates and charges based on market or average prices, price caps, index based prices, and prices that: (A) use performance based rewards or penalties, either related to or unrelated to the energy utility's return or property; and (B) are designed to promote efficiency in the rendering of retail energy services." Ind. Code 8–1–2.5–6(a)(2).

An energy utility which elects to become subject to Section 6 of the Act "shall file with the commission and alternative regulatory plan proposing how the commission will approve retail energy services or just and reasonable rates and charges for the energy utility's retail energy service." Ind.Code 8–1–2.5–6(c). The energy utility is required to "publish a notice of the filing of a petition . . . in a newspaper of general circulation publish-ed in any county in which the energy utility provides retail energy service." Ind.Code 8–1–2.5–6(d). After notice and hearing, the Commission may "approve, reject, or modify the energy utility's proposed plan if the commission finds that such action is consistent with the public interest." Ind.Code 8–1–2.5–6(e).

In the present case, the supply agreements require that ProLiance provide the Utilities with specified quantities of gas designed to meet the Utilities' firm gas supply needs at prices established using monthly index prices set forth in various FERC publications. The index prices are passed on to the Utilities' customers as a gas cost through the Utilities' respective quarterly GCA proceedings. The charges set forth by the various indexes are not necessarily the prices which ProLiance pays for the gas. Accordingly, it is possible for ProLiance to earn a profit or experience a loss in providing the services to the Utilities. Because ProLiance is an affiliated company of the Utilities, Indiana Gas's parent and Citizens Gas itself have, in an indirect way, the opportunity to essentially profit on the commodity cost of gas. [2]

The Commission found that this type of pricing arrangement "is a result not specifically contemplated in the pertinent subsections of [the traditional regulation statute, Ind.Code 8–1–2–42]." Commission's Order at 46. The Commission then noted that neither Indiana Gas nor Citizens Gas had filed an alternative regulatory proposal with the Commission under the Act, "by which it may have requested authority to earn a profit or experience a loss with respect to the commodity cost of gas under certain circumstances." *Id.* Thus, the Commission noted that the Utilities were attempting to accomplish the goal of the Act in an "inappropriate way." *Id.* at 47. The Commission later "expressed concern that the Respondent utilities did not avail themselves of the relief available in the form of alternative regulatory

---

**1.** Indiana Gas and Citizens Gas concede that they are "energy utilities" under the Act. *See* Ind.Code 8–1–2.5–2.

**2.** The Fundamental Operating Agreement is an agreement between IGC Energy, Inc. ("IGC") and Citizens Bi–Products Coal Company ("CBP"). IGC is a wholly owned subsidiary of Indiana Energy, Inc., which is the parent of Indiana Gas. CBP is a wholly owned subsidiary of Citizens Gas, which is a public trust. By the Fundamental Operating Agreement, IGC and CBP created ProLiance.

proposals, by which statutory incentive opportunities could be explored." *Id.* at 55–56.

Nevertheless, the Commission found that the supply agreements were in the public interest and should not be disapproved. The Commission further found that the index pricing arrangements should be "remedied through proper notice, hearings, and findings in connection with [the Utilities'] GCA filings." *Id.* at 47. In doing so, the Commission stated that its finding that the agreements were in the public interest "should not be construed as a signal to the public that we consider the method chosen in this instance to be the most appropriate one for energy utilities to use to address the onset of competition." *Id.* at 56. The Commission then stated that "our preference by far would be to see such arrangements presented to the Commission as a proposal pursuant to [the Act.]" *Id.* This preference was stated because "[t]he legislature has provided [the Act] as a means for utilities to seek prospective consideration of such proposals prior to their being placed in effect." *Id.*

 We have recently held that the Act vests in the Commission "wide authority to decide to what degree to exercise its jurisdiction over energy utilities." *Citizens Action Coalition of Indiana, Inc. v. Indiana Statewide Association of Rural Electric Cooperatives, Inc.,* 693 N.E.2d 1324, 1330 (Ind.Ct. App.1998). However, as an administrative agency created by the legislature, the Commission cannot exercise power beyond that given by statute. *See United Rural Electric Membership Corp. v. Indiana & Michigan Electric Company,* 549 N.E.2d 1019, 1021 (Ind.1990), *reh'g denied.* Any doubts about the extent of statutory authority are resolved against the existence of such authority. *Id.*

 Where the legislature creates a right and provides the method of its enforcement, the method provided is exclusive. *Monon Railroad Company v. Citizens of Sherwood Forest Addition, Marion County,* 146 Ind. App. 620, 257 N.E.2d 846, 849 (Ind.Ct.App. 1970) (*quoting Public Service Commission of Indiana v. City of Indianapolis,* 235 Ind. 70, 83, 131 N.E.2d 308, 313 (1956)). The Act gives utilities the right to obtain alternative regulation, and it gives the Commission the authority to deviate from traditional regulation and to exercise alternative regulation. However, the Act also prescribes the exclusive method by which utilities can seek to obtain alternative regulation, and it specifically states that the Commission's authority to exercise such regulation begins only after the utilities' compliance with the Act. Section 4 of the Act unambiguously restricts the Commission's authority to grant alternative regulatory treatment to the case where a petition requesting such treatment is submitted to the Commission. Section 6 unambiguously restricts the Commission's authority to grant alternative regulatory treatment to a case where an alternative regulatory plan is filed. Section 6 also restricts the Commission's authority to the case where proper notice has been given and a hearing has been held. The Utilities failed to submit the required petition or file the required alternative regulatory plan. Furthermore, the required notice was not given and the required hearing was not held. The Commission did not have the authority to waive these exclusive requirements and to initiate alternative regulation through GCA procedures.

The Utilities contend that the Commission's attempt to defer its determination of the propriety of index pricing did not constitute an approval of that part of the supply agreements. The Utilities' argument is flawed in that the Commission has already explicitly found that the index pricing arrangement is not authorized under traditional regulatory statutes and that it is the type of pricing arrangement covered by the Act. These findings, coupled with the Utilities' failure to comply with the Act's prerequisites, deprived the Commission of the authority to do anything but disapprove the supply agreements.

The Utilities also contend that the Commission erroneously found that the index pricing arrangement constituted the type of pricing arrangement allowed only through alternative regulation. Again, the Utilities' argument is flawed in that it ignores the language of Ind.Code 8–1–2.5–6(a)(2), which explicitly and unambiguously states that index based pricing arrangements are the subject of alternative regulation.

The Utilities further contend that the index pricing agreements provide only the price they pay ProLiance for the commodity and that the incurrence of such expenses is within the Utilities' discretion, subject to adjustment in a GCA proceeding. This argument again ignores the explicit and unambiguous language of Ind.Code 8–1–2.5–6(a)(2).

## CONCLUSION

The Commission exceeded its authority in implementing the alternative regulatory treatment of the Act when the Utilities failed to comply with the prerequisites to invocation of alternative regulation.

We reverse and remand to the Commission with instructions that the supply agreements be disapproved.

Reversed and remanded.

RUCKER, J., and GARRARD, J., concur.