UNITED STATES GYPSUM, INC.; General Motors Corp.; Reid Hospital & Healthcare Services; Belden Wire & Cable Co.; Eli Lilly & Co.; Knauf Fiber Glass GmbH; Dana Corp.; Aluminum Co. of America; Hayes Wheels Int'l; Thompson Consumer Electronics; Visy Paper, Inc.; Jerome E. Polk; Grant Smith; Julia L. Vaughn; Mark S. Bailey; William G. Simmons; Timothy E. Peterson; Robert V. Benge; Citizens Action Coalition of Indiana, Inc.; United Senior Action, Inc.; Indiana Office of Utility Consumer Counselor; and Enron Capital & Trade Resources Corp., Appellants (Petitioners and Intervenors below),

v.

INDIANA GAS CO., INC.; Board of Directors For Utilities of the Dept. of Public Utilities of the City of Indianapolis, as Successor Trustee of a Public Charitable Trust, d/b/a Citizens Gas & Coke Utility; and ProLiance Energy, LLC, Appellees (Respondents below).

No. 93S02–9904–EX–251.

Supreme Court of Indiana.

Sept. 22, 2000.

---

finding of the grounds constituting "good cause", a question not presented by this case.

John F. Wickes, Jr., Todd A. Richardson, Pamela H. Sherwood, Indianapolis, IN, Attorneys for Appellants United States Gypsum, et al.

Anne E. Becker, Christopher C. Earle, Timothy Stewart, Indianapolis, IN, Attorneys for Appellants Office of Utility Consumer Counselor.

C. Kirby Mullen, Michael A. Mullett, Reed W. Cearley, Indianapolis, IN, Attorneys for Appellants Citizens Action Coalition, et al.

L. Parvin Price, George T. Patton, Jr., Jeffrey M. Reed, Indianapolis, IN, Attorneys for Appellant Enron Capital & Trade.

Ronald E. Christian, Robert E. Heidorn, Daniel W. McGill, Stanley C. Fickle, Indianapolis, IN, Attorneys for Appellee Indiana Gas.

Harry V. Huffman, Michael B. Cracraft, Philip B. McKiernan, Indianapolis, IN, Attorneys for Appellee Citizens Gas & Coke.

Wayne C. Turner, Steven M. Sherman, Indianapolis, IN, Attorneys for Appellee ProLiance Energy.

George A. Porch, Evansville, IN, Peter L. Hatton, Merrillville, IN, Attorneys for Amici Curiae Ohio Valley Gas Corp., et al.

SHEPARD, Chief Justice.

Affiliates of two Indiana natural gas utilities created ProLiance Energy for the purpose of procuring wholesale natural gas supply for the utilities. Opponents complained that ProLiance was an improper attempt to avoid state regulation and petitioned the Indiana Utility Regulatory Commission to disapprove ProLiance as against the public interest. The Commission concluded that ProLiance was in the public interest, however, and denied the opponents' petition. We affirm.

**Facts and Procedural History**

Indiana Gas Company, Inc., and Citizens Gas & Coke Utility (collectively "the Utilities") provide natural gas to retail customers through their intrastate pipelines at rates regulated by the Commission. The Utilities, known as local distribution companies ("LDCs"), receive gas at city gates where interstate pipelines connect to the LDCs' intrastate pipelines.

Historically, LDCs purchased both gas and transportation of that gas as a single "bundled" product from interstate pipelines. Beginning in 1978, Congress and the Federal Energy Regulatory Commission ("FERC") took steps to stimulate competition, leading interstate pipelines to offer transportation as a separate service. This created a competitive market for the gas itself and allowed customers to sell or "release" pipeline capacity that they did not need. With these changes emerged

interstate marketers who sell gas to LDCs and large volume consumers. These large volume consumers are known as transportation customers because they buy gas directly from the marketer but rely on LDCs to provide local, intrastate pipeline transportation.[1]

Against this background, IGC Energy, Inc. (Indiana Gas's sister company)[2] and Citizens By–Products Coal Co. (a wholly owned subsidiary of Citizens Gas) entered into a Fundamental Operating Agreement in March 1996 creating ProLiance Energy, a limited liability company. ProLiance was designed to allow the Utilities to benefit from the synergistic effects of combined gas supply and planning functions, including enhanced leverage in the wholesale gas marketplace and non-duplication of resources previously devoted by each Utility to those functions. Each of ProLiance's creators owns 50% of ProLiance and, through a board, maintains 50% control over it, thus allowing the Utilities the advantages of dealing with an affiliate rather than a third-party marketer.

ProLiance, in turn, entered into separate Gas Sales and Portfolio Administration Agreements with each of the Utilities, covering four and a half years. These agreements made ProLiance responsible for procuring wholesale gas supply and interstate pipeline transportation service for the Utilities. To that end, ProLiance took over the Utilities' existing gas supply contracts and pipeline capacity and assumed responsibility for negotiating new supply contracts when current ones expire. ProLiance also became responsible for scheduling gas delivery to the Utilities and for developing future supply plans, subject to the Utilities' approval. These agreements were filed with the Commission.

The agreements provide that the Utilities will purchase gas from ProLiance at index prices established in trade publications, although the price that ProLiance actually pays for gas may differ from the index price. Additionally, the agreements say the Utilities will pay ProLiance an annual administration fee for performing gas-supply and planning services that the Utilities previously performed themselves. ProLiance also provides the Utilities with a transportation credit in exchange for ProLiance's right to sell off any unused pipeline capacity available once ProLiance has met the gas needs of the Utilities and their gas customers. The transportation credit and the administration fee are partially based on historic benchmarks.

Some of the Utilities' transportation customers petitioned the Commission to disapprove the ProLiance agreements. Ten residential customers of Citizens Gas filed "joinders" purporting to add themselves as petitioners. The Office of Utility Consumer Counselor ("OUCC") appeared on behalf of the public and opposed the ProLiance agreements. Some citizen groups and gas marketers also intervened and opposed the agreements. We refer to these customers and groups adverse to the ProLiance agreements collectively as "Opponents."

The Commission conducted a five-day hearing. On September 12, 1997, the Commission concluded, in lengthy findings, that the ProLiance agreements were in the public interest, so it refused to disapprove them.

The Court of Appeals reversed and instructed the Commission to disapprove the agreements. *United States Gypsum, Inc. v. Indiana Gas Co.*, 705 N.E.2d 1017 (Ind. Ct.App.1998). It concluded that ProLiance's index-based pricing arrangement

---

1. For more background on these changes, see *General Motors Corp. v. Tracy*, 519 U.S. 278, 283–84, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997); *Teledyne Portland Forge v. Ohio Valley Gas Corp.*, 666 N.E.2d 1278, 1280 (Ind.Ct. App.1996).

2. IGC Energy, Inc., is a wholly-owned subsidiary of Indiana Energy, Inc., the parent, holding company of Indiana Gas.

was an attempt by the Utilities to circumvent traditional regulation and that their failure to offer a proposal under the Alternative Utility Regulation Act, Indiana Code Chapter 8–1–2.5, required the Commission to disapprove the ProLiance agreements. 705 N.E.2d at 1021–22.

After hearing oral argument, we granted transfer at the request of the Utilities and ProLiance.

### Our Standard of Review

■■■ An order of the Commission is subject to appellate review to determine whether it is supported by specific findings of fact and by sufficient evidence, as well as to determine whether the order is contrary to law. *Citizens Action Coalition of Indiana, Inc. v. Public Serv. Co.,* 582 N.E.2d 330 (Ind.1991). On matters within its jurisdiction, the Commission enjoys wide discretion. *See In re Northwestern Indiana Telephone Co.,* 201 Ind. 667, 171 N.E. 65 (1930). The Commission's findings and decision will not be lightly overridden just because we might reach a contrary opinion on the same evidence. *Public Serv. Comm'n v. City of Indianapolis,* 235 Ind. 70, 131 N.E.2d 308 (1956).

### I. Jurisdiction

■■■ The General Assembly created the Commission primarily as a "fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." *United Rural Elec. Membership Corp. v. Indiana & Mich. Elec. Co.,* 549 N.E.2d 1019, 1021 (Ind.1990) ("*UREMC*"). Its authority "includes implicit powers necessary to effectuate the statutory regulatory scheme." *Office of Utility Consumer Counselor v. Public Serv. Co.,* 608 N.E.2d 1362, 1363–64 (Ind. 1993). Still, as a creation of the legislature, the Commission may exercise only that power conferred by statute. *UREMC,* 549 N.E.2d at 1021.

**3.** All statutory citations are to the 1998 version of the Indiana Code unless otherwise

Opponents petitioned under a statute that allows the Commission to investigate a complaint by a sufficient number of complainants "against any *public utility*" that "any regulation ... practice or act whatsoever affecting or relating to the service of *any public utility,* or any service in connection therewith, is in any respect unreasonable, unsafe, insufficient or unjustly discriminatory...." Ind.Code § 8–1–2–54 [3] (emphasis added). A "public utility" is defined, in pertinent part, as any "corporation, company, partnership, [or] limited liability company ... that may own, operate, manage, or control any plant or equipment within the state for the ... production, transmission, delivery, or furnishing of heat, light, water, or power...." Ind. Code § 8–1–2–1(a).

Opponents named both Utilities and ProLiance as respondents to their petition and believe that all three are subject to investigation under Section 54. It is undisputed that Indiana Gas is a public utility. However, the Commission granted ProLiance's motion to dismiss, in part, after finding that ProLiance is not a public utility. The Commission found that ProLiance does not own, operate, manage, or control any plant or equipment for producing, transmitting, delivering or furnishing gas, and that the Utilities retained control over their facilities. (R. at 1603.) It found that all distribution functions remained with the Utilities. Consequently, the Commission concluded that Section 54 did not provide it with jurisdiction over ProLiance itself.

■■■ Opponents attack this conclusion on two grounds. First, they say that the Commission construed "public utility" too narrowly. They argue that ProLiance's integral role in gas supply planning and procurement makes it a public utility. Nonetheless, we agree with the Commission because the functions performed by

indicated.

ProLiance do not constitute operation, management, or control of a plant or equipment for transmitting or delivering gas; ProLiance performs services for the Utilities, not for the Utilities' retail customers. We decline Opponents' invitation to equate office equipment and clerical supplies, such as telephones and computers that ProLiance uses, with a "plant or equipment" for distributing gas within the meaning of Ind.Code § 8–1–2–1(a)(2).[4]

Second, Opponents say that the Commission had jurisdiction because ProLiance is an "affiliated interest" within the meaning of Indiana Code § 8–1–2–49(2). Subsection 49(2) allows the Commission access to the records of affiliated interests involving transactions with the public utility related to matters within the Commission's jurisdiction, not including ownership of stock. *See id.* Further, Subsection 49(2) provides that "[n]o management, construction, engineering, or similar contract, made after March 8, 1933, with any affiliated interest" is effective until it is filed with the Commission, and the Commission has authority to disapprove such contracts if they are not in the public interest. *Id.*

Despite granting ProLiance's motion to dismiss in part, the Commission ordered ProLiance to remain a party to this proceeding, pursuant to Indiana Code § 8–1–2–49, for the purposes of answering the other parties' discovery requests and providing information to the Commission. (R. at 1597, 1602.) Furthermore, the Commission squarely decided under Subsection 49(2) that the ProLiance agreements were in the public interest. Although Subsection 49(2) may have given the Commission access to certain affiliate records and accounts and the authority to review affiliate contracts, we find no error in the Commission's determination that it lacked plenary jurisdiction over ProLiance itself under Section 54.

**4.** We agree with the Commission that ProLiance does not own, operate, manage or control a plant or equipment for transmitting or delivering gas, and thus see little statutory

■ Next, we consider whether the Section 54 petition gave the Commission jurisdiction over Citizens Gas. Indiana Code § 8–1–2–1(a) specifically exempts municipally owned facilities from the definition of "public utility." The Commission concluded that Citizens Gas is a municipal utility and therefore not a public utility subject to investigation under Section 54. *See Cities & Towns of Anderson v. Public Serv. Comm'n,* 397 N.E.2d 303, 310 (Ind.Ct.App. 1979) (Commission's authority to investigate complaints against public utilities under Section 54 does not extend to municipal utilities); *Citizens Gas & Coke Util. v. Sloan,* 136 Ind.App. 297, 196 N.E.2d 290, (*en banc*), *reh'g denied,* 136 Ind.App. 297, 311–12, 197 N.E.2d 312, 313 (1964) (Section 54's similarly-worded predecessor, § 54–408 (Burns' 1951 Replacement) did not allow Commission general authority to investigate Citizens Gas, a municipal utility).

Opponents agree that Citizens Gas is a municipal utility. Despite the earlier Court of Appeals opinions, Opponents argue that the Commission may investigate Citizens Gas under Section 54. Opponents reason that the rules of service and rates adopted by Citizens Gas's board of directors take effect

only after the rules and rates have been filed with and approved by the commission and such approval shall be granted by the Commission only after notice of hearing and hearing as provided by IC 8–1–1 and IC 8–1–2, and only after determining compliance of the rates of service with IC 8–1.5–3–8 and IC 8–1.5–3–10 and only after determining compliance of the rules of service with IC 8–1–1 and IC 8–1–2, along with the rules and standards of service for municipal utilities of Indiana approved by the commission.

support for Opponents' additional argument that the definition of "public utility" includes an entity that indirectly furnishes gas to the public.

Ind.Code § 8–1–11.1–3(c)(9). Opponents say that these cross-references to Chapter 8–1–2 necessarily make a complaint about Citizens Gas the proper subject of a petition under Section 54. In addition, symmetry favors treating municipal utilities like public utilities, Opponents contend.

We are not persuaded. The legislature explicitly exempted municipal utilities from the definition of "public utility." Other statutes' explicit references to municipal utilities in conjunction with public utilities show that the legislature knows how to say and include municipal utilities when it so desires. *See, e.g.,* Ind.Code § 8–1–2–42(a), (g); *accord Stucker Fork Conservancy Dist. v. Indiana Utility Regulatory Comm'n,* 600 N.E.2d 955, 957–58 (Ind.Ct. App.1992) (municipal utilities are subject to Commission's jurisdiction "only when specifically provided for by statute"). Thus, we hold that the Commission correctly determined that its jurisdiction under Section 54 did not extend to Citizens Gas.[5]

In sum, we affirm the Commission's conclusion that it lacked plenary jurisdiction over ProLiance and Citizens Gas in this Section 54 proceeding. In any event, Indiana Gas is a public utility, so we address the remaining issues.

## II. Traditional and Alternative Utility Regulation

We turn next to the parties' dispute over whether the ProLiance agreements were a proposal for Alternative Utility Regulation (AUR) and thus could only be permitted by the Commission if offered and approved as an AUR proposal. This requires a brief overview of traditional regulation and the language of the AUR Act.

The bedrock principle behind utility regulation is the so-called "regulatory compact," which

arises out of a "bargain" struck between the utilities and the state. As a quid pro quo for being granted a monopoly in a geographical area for the provision of a particular good or service, the utility is subject to regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer. At the same time, the utility is not permitted to charge rates at the level which its status as a monopolist could command in a free market. Rather, the utility is allowed to earn a "fair rate of return" on its "rate base." Thus, it becomes the Commission's primary task at periodic rate proceedings to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors.

*Indiana Gas Co., Inc. v. Office of Utility Consumer Counselor ("Indiana Gas I"),*

---

5. Early in the proceeding, Citizens Gas presented evidence that only three of the petitioning Opponents were its customers (not ten as required by Indiana Code § 8–1–2–54) and moved to dismiss on that ground. (R. at 162–166.) The Opponents responded by filing "joinders" that cited Indiana Trial Rule 20(A) and were signed by ten residential customers of Citizens Gas. (R. at 306–14.) This, in turn, prompted Citizens Gas to move to strike the joinders on the ground that they purported to add petitioners without seeking the necessary permission from the Commission to intervene. (R. at 353–57.) By the parties' agreement, the Commission deferred its ruling on Citizen Gas's motion to dismiss until the case's conclusion. (R. at 1597–98.) Opponents acknowledge that the final order contained the finding that "an insufficient num-

ber of Citizens Gas's customers are among the Petitioners and, therefore Petitioners have not satisfied the standing requirement in Section 54." (R. at 1600.) Opponents argue that, to the extent this granted Citizens Gas's motion to dismiss, it is void without adequate findings or evidentiary support. But evidence that only three of the original petitioners were Citizens Gas customers appears to support Commission's finding and conclusion. Although Opponents have asserted in a reply brief something akin to an argument that the Commission abused its discretion if it did not allow joinder, an argument raised for the first time in a reply brief is waived. *Gray v. State,* 593 N.E.2d 1188, 1191 (Ind.1992). In any event, we need not decide this issue where the Commission properly found another reason why it lacked jurisdiction over Citizens Gas.

575 N.E.2d 1044, 1046 (Ind.Ct.App.1991) (citations omitted).

This fair-rate-of-return concept underlies traditional rate regulation. *See Office of Utility Consumer Counselor v. Gary–Hobart Water Corp.*, 650 N.E.2d 1201 (Ind.Ct.App.1995); *Indiana Gas I*, 575 N.E.2d at 1046. In determining fair rates, the Commission considers a representative level of anticipated revenues and expenses and the property employed by the utility to provide service to its customers. *See City of Evansville v. Southern Indiana Gas & Elec. Co.*, 167 Ind.App. 472, 478–82, 339 N.E.2d 562, 568–71; *Re Northern Indiana Public Serv. Co.*, No. 40180, 166 PUR4th 213, 224, 1995 WL 795042 (IURC December 28, 1995). The Commission compares the property used and useful for the production of current service to the utility's revenues in order to quantify the return being provided by the existing rates. *Id.* If the Commission determines that a utility's rates have become unjust and unreasonable, it may modify them by ordering just and reasonable rates to be charged prospectively. Ind.Code § 8–1–2–68. This rate-setting procedure is comprehensive: "the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years." *City of Evansville*, 167 Ind.App. at 482, 339 N.E.2d at 570–71.

Traditional regulation also allows a gas utility to obtain an adjustment of its rates to reflect fluctuations in gas cost without undergoing a formal rate proceeding. *See* Ind.Code § 8–1–2–42(g). A gas cost adjustment permits the utility to pass along to its customers on a dollar-for-dollar basis any fluctuations in the gas cost experienced by the utility. *Indiana Gas Co., Inc. v. Office of Utility Consumer Counselor ("Indiana Gas II")*, 610 N.E.2d 865, 867 (Ind.Ct.App.1993); *see Indiana Gas I*, 575 N.E.2d at 1046–49. As part of

the gas cost adjustment, the Commission applies an earnings test to ensure that the utility's gas costs are not being passed along to the consumer in a way that allows the utility "to earn a higher return than that authorized by the Commission in the utility's last rate case." *Indiana Gas I*, 575 N.E.2d at 1046 (citing Ind.Code § 8–1–2–42(g)(3)(C)). The clear legislative intent here is preventing a utility from over-earning. *Id.* at 1052. For this reason, the "earnings test" applies when gas costs decrease as well as when they increase. *Id.* at 1049.

When a gas cost adjustment is sought, the OUCC may examine the books and records of the utility to determine the cost of gas on which the adjustment is being sought, and it must make a report to the Commission. Ind.Code § 8–1–2–42(g)(1). In any event, the OUCC must examine a gas utility's books and records pertaining to the cost of gas not less than annually and provide the Commission with a report; if appropriate, the OUCC may request a reduction or elimination of a gas cost adjustment. Ind.Code § 8–1–2–42(g)(2).

The Commission found that the index-priced supply arrangement in the ProLiance agreements allowed Citizens Gas and the parent of Indiana Gas an opportunity to profit indirectly from the commodity cost of gas. It characterized this as "a result not specifically contemplated in the pertinent subsections of Section 42." (R. at 1641.) The Commission expressed a preference for considering such an arrangement as a proposal under the AUR Act. Nevertheless, it noted that both Utilities had gas cost adjustment proceedings pending, concluded that "this situation could be remedied through proper notice, hearing, and findings in connection with the [Utilities'] GCA [gas cost adjustment] filings" and that "such an alternative measure should be explored in that proceeding." (R. at 1642.)

Contrary to Opponents' claim on appeal, the Commission was not con-

strained to considering the ProLiance agreements as a proposal under the AUR Act. The Act permits a utility to propose, and the Commission to adopt, alternatives to traditional regulation. *Citizens Action Coalition, Inc. v. Indiana Statewide Ass'n of Rural Elec. Cooperatives*, 693 N.E.2d 1324 (Ind.Ct.App.1998). Our examination of the Act reveals that it is concerned with the regulation of *retail* service, rates and charges, not wholesale supply arrangements to a utility.

The legislative findings prefacing the Act, passed in 1995, refer to the Commission's goal of providing "safe, adequate, efficient, and economical *retail* energy services...." Ind.Code § 8–1–2.5–1(1) (West Supp.1999) (emphasis added). They note that "an environment in which Indiana *consumers* will have available state-of-the-art energy services at economical and reasonable costs will be furthered by flexibility in the regulation of energy services." *Id.* at (4) (emphasis added). Further, they note the need for the Commission to exercise its authority in a flexible manner to "regulate and control the provision of energy services *to the public* in an increasingly competitive environment, giving due regard to the interests of *consumers and the public,* and to the continued availability of safe, adequate, efficient, and economical energy service." *Id.* at (6) (emphasis added). The AUR Act defines "retail energy service" to mean "energy service furnished by an energy utility to a customer for ultimate consumption." Ind.Code § 8–1–2.5–3 (West Supp.1999).

The AUR Act allows the Commission two alternatives to traditional regulation. First, the Commission may, after notice and a hearing, "commence an orderly process to decline to exercise, in whole or in part, its jurisdiction over either the energy utility or the retail energy service of the energy utility, or both." Ind.Code § 8–1–2.5–5(a) (West Supp.1999). Or, second,

 (a) [I]n approving *retail energy services or establishing just and reasonable rates and charges, or both* for an energy utility electing to become subject to this section, the commission may do the following:

(1) Adopt alternative regulatory practices, procedures, and mechanisms, and establish rates and charges that:

 (A) are in the public interest ...; and

 (B) enhance or maintain the value of the energy utility's *retail energy services* or property;

including practices, procedures, and mechanisms focusing on the price, quality, reliability, and efficiency of the service provided by the energy utility.

(2) Establish rates and charges based on market or average prices, price caps, index based prices, and prices that:

 (A) use performance based rewards or penalties, either related to or unrelated to the energy utility's return or property; and

 (B) are designed to promote efficiency in the rendering of *retail energy services.*

 . . . .

(c) An energy utility electing to become subject to this section shall file with the commission an alternative regulatory plan proposing how the commission will approve *retail energy services or just and reasonable rates and charges for the energy utility's retail energy service.*

Ind.Code § 8–1–2.5–6(a), (c) (West Supp. 1999) (emphasis added). A utility's request for relief under Section 6 "shall be limited to approval of its energy services or the establishment of its rates and charges, or both." Ind.Code § 8–1–2.5–4 (West Supp.1999).

 These repeated references to retail energy services and the establishment of rates and charges persuade us that the legislature did not intend to compel the Commission to exercise jurisdiction over a *wholesale* gas supply arrangement based on index pricing, even one between a utility and its affiliate, solely under AUR procedures. The Commission found that it

had the authority under traditional regulatory practice to consider the ProLiance agreements, including their index-based pricing of wholesale gas supply. We agree. The AUR Act was intended to supplement, not restrict, the authority that the Commission enjoys under traditional regulation.

At least two traditional regulatory tools pre-dating the AUR Act allow the Commission to exercise regulatory authority here. The first, discussed above, requires that certain affiliate contracts be filed with the Commission before becoming effective and allows the Commission to disapprove them if they are not in the public interest. *See* Ind.Code § 8–1–2–49(2). Here, the Opponents themselves invoked Section 49 as authority for the Commission to consider the ProLiance agreements. In the end, the Commission concluded under Section 49 that the ProLiance agreements were in the public interest.

The second method, a gas cost adjustment proceeding under Indiana Code § 8–1–2–42(g), has also been discussed above. The Commission found that the ProLiance agreements raised concern because they created the possibility for Citizens Gas and the parent of Indiana Gas to profit from the commodity cost of gas. Yet the Commission was satisfied that those concerns could and should be addressed in the Utilities' pending gas cost adjustment proceedings. (R. at 1642, 1652.) The Commission also expressed a willingness to scrutinize carefully the gas costs associated with Pro-Liance: it explicitly warned that the actual costs the Utilities pay for gas will not necessarily be allowed as reasonable gas costs under these circumstances because

risks and opportunities have been shifted among the Utilities, their investors, and customers. (R. at 1654.)

■ Opponents object to consideration of the ProLiance index-pricing arrangements in a gas cost adjustment proceeding because, they say, the OUCC will not have access to critical ProLiance records and information, including its actual cost of gas. The Opponents' fear is not well founded in light of the provisions in Ind. Code § 8–1–2–49(2) affording the Commission access to records of a utility's "affiliated interests" while it is pursuing matters within the Commission's jurisdiction.[6] Thus, we conclude that this index-based pricing of wholesale gas supply to the Utilities did not require approval under the AUR Act.[7]

■ We conclude also that the Commission may consider the reasonableness of the transportation credit and the administration fee in the gas cost adjustment proceeding, as it has indicated an intent to do. (R. at 1651.) Gas costs "may include the gas utility's costs for gas purchased by it from pipeline suppliers . . . and other expenses relating to gas costs as shall be approved by the commission." Ind.Code § 8–1–2–42(g); *see Re Northern Indiana Public Serv. Co.*, 166 PUR4th at 226 (gas costs calculations include commodity, pipeline capacity and storage costs, as well as credits generated against costs, including those received by LDCs from pipeline suppliers and revenues to LDCs from release of capacity); *accord Teledyne*, 666 N.E.2d at 1282 (gas costs properly included extra expense that gas utility incurred as a result of tariffs imposed by interstate

6. When asked at oral argument about the Opponents' contention that the OUCC would not have access to ProLiance's data in gas cost adjustment proceedings, counsel representing ProLiance stated that he disagreed.

7. Our conclusion is bolstered by the Commission's approval of another gas utility's recovery of gas costs, prior to the AUR Act, based in part on index-based pricing of gas sold by a marketer to the gas utility. *See Re Ohio Val-*

*ley Gas Corp.*, No. 37354–GCA41, 1994 WL 121361 (IURC March 4, 1994). Indeed, the Commission noted that Opponents did not appear to object to an LDC's use of indexes in gas cost adjustment filings or to marketers profiting from the sale of commodity gas to an LDC; instead, the Commission noted, Opponents objected to an affiliate profiting from the commodity sale of gas to an affiliated LDC. (R. at 1642.)

pipelines to cover their transition costs in implementing FERC order to unbundle services).

We hold that the Commission was not constrained to considering these agreements only as a proposal under the AUR Act.[8]

## III. Transfer or Merger of Utility Works

 A public utility may not "sell, assign, transfer, lease, or encumber its franchise, works, or system to any other person, partnership, limited liability company, or corporation, or contract for the operation of any part of its works or system by any other person, partnership, limited liability company, or corporation, without the approval of the Commission after hearing." Ind.Code § 8–1–2–83(a). In this section, we decide whether the Commission was required to disapprove the ProLiance agreements because transfers associated with them had not been preapproved by the Commission.

The Commission rejected the Opponents' arguments that the ProLiance agreements required preapproval as a transfer of Indiana Gas's works or system to ProLiance. It construed "works" and "system" in light of *Illinois–Indiana Cable Television Ass'n v. Public Service Comm'n*, 427 N.E.2d 1100, 1108 (Ind.Ct. App.1981). In *Illinois–Indiana Cable*, the Court of Appeals determined that the Commission lacked jurisdiction under Section 83 over a public utility's lease of part of its poles to accommodate attachments by a cable television company. *Id.* The court construed a utility's franchise, works or system to mean "an entire operational unity of a utility." *Id.*

Applying *Illinois–Indiana Cable* here, the Commission found that the agreements provide for Indiana Gas to retain ownership, management and "complete unilateral control of its physical [g]as delivery, distribution transportation and storage facilities." (R. at 1606.) Likewise, the Commission concluded that Indiana Gas remains the certified provider of gas to customers in its service area and has not contracted with ProLiance for the operation of any part of its franchise, works or system. (R. at 1606.) The Commission also noted that Indiana Gas will continue to develop demand forecasts, review and approve supply plans developed by ProLiance, operate gas storage fields, etc. (R. at 1606.)

On appeal, the Opponents argue that the Commission erred by reading the words "works" and "system" too narrowly to include only physical facilities. They claim that Indiana Gas's assignment of existing gas supply contracts and transfer of pipeline capacity and some gas-supply and planning personnel to ProLiance constituted a transfer of a part of Indiana Gas's works or system.

The statutes do not define the terms "works" and "system."[9] For our purposes, it is important that the legislature has defined a "utility" as any *"plant or equipment"* in the state used for, *inter alia,* the transmission, delivery, or furnish-

---

8. Our resolution of the AUR issue as a matter of state statutory interpretation, as well as our affirmance of the Commission's ruling that it has no plenary jurisdiction over ProLiance under Section 54, make it unnecessary to address ProLiance's argument that federal law preempts state regulation of ProLiance's gas purchases and sales. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988) (The National Gas Act of 1938 confers upon FERC "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale").

9. As pertinent here, common definitions of "works" include "[a] factory, plant, or similar building or complex of buildings where a specific type of business or industry is carried on" or "[i]nternal mechanism: *the works of a watch." The American Heritage Dictionary of the English Language* 2056 (3d ed.1996). A system is "[a] group of interacting, interrelated, or interdependent elements forming a complete whole ... functionally related groups of elements, especially ... [a] network of structures and channels, as for communication, travel or distribution...." *Id.* at 1823.

ing of power. Ind.Code § 8–1–2–1(g) (emphasis added). A public utility is an entity that may "own, operate, manage, or control any *plant or equipment*" in the state for the same purposes. Ind.Code § 8–1–2–1(a)(emphasis added). In another utility statute, the legislature refers to a "franchise to own, operate, manage, or control any *plant or equipment* of any public utility...." Ind.Code § 8–1–2–91 (emphasis added). More generally, the primary focus of public utility regulation is ensuring that the utilities provide "reasonably adequate service and facilities." Ind.Code § 8–1–2–4. "This service includes the product itself, the use or accommodation afforded the customers and the equipment employed by the utility in performing the service." *Prior v. GTE North, Inc.*, 681 N.E.2d 768, 773 (Ind.Ct.App.1997), *trans. denied.*

■ Where statutes address the same subject, they are *in pari materia*, and we harmonize them if possible. *See Citizens Action Coalition v. Northern Indiana Public Serv. Co.*, 485 N.E.2d 610, 617 (Ind. 1985), *cert. denied,* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986). Consequently, we agree with the Commission that Indiana Gas did not transfer ownership or control over its works or system. Indiana Gas did not transfer to ProLiance any plant or equipment for distributing gas. And although wholesale gas supply and the planning and scheduling thereof are unquestionably important to Indiana Gas, none of the matters relied upon by the Opponents constitute an indivisible part of Indiana Gas's system or works absent some closer nexus with the Utilities' customer service or distribution functions.[10]

Opponents also claim that certain prohibitions in Indiana Code § 8–1–2–84 regulating mergers between two public utilities prohibited the agreements between Indiana Gas and ProLiance absent prior approval by the Commission. However, as we previously held, the Commission properly determined that ProLiance is not a public utility. Still, Opponents insist that Indiana Gas violated at least Indiana Code § 8–1–2–84(f), which applies to a single public utility and reads, "No such public utility shall encumber its used and useful property or business or any part thereof without the approval of the Commission and the consent, authority, and approval of the owners of three-fourths (¾) of its voting stock." The term "encumber" usually means "to charge, or burden with financial obligations or mortgages." *Underwood v. Fairbanks, Morse & Co.*, 205 Ind. 316, 334, 185 N.E. 118, 124 (1933). Opponents do not argue, much less demonstrate, how these transfers were an encumbrance.

### IV. Earlier Settlement

■ The Commission also rejected the Opponents' argument that the ProLiance agreements should be disapproved because they violated earlier settlements that Indiana Gas made with some transportation customers and the OUCC in 1994–95. In those settlements, Indiana Gas agreed not to request "sharing" of revenues from its capacity releases and to "reduce its gas costs with all amounts realized from capacity release." (R. at 1624.) Indiana Gas also agreed that its customers could negotiate for pre-arranged capacity releases on a long-term basis, based on Indiana Gas's "determination of available capacity," and that capacity would be awarded by "determining the greatest economic value among

---

**10.** In recently holding that a transfer of outstanding stock by a utility or its parent does not constitute a transfer of a franchise, works or system under Subsection 83(a), a majority of this Court declined to use an operation-and-control test that was based on language from *Illinois–Indiana Cable. See Indiana Bell Tel. Co. v. Indiana Utility Regulatory Comm'n,* 715 N.E.2d 351, 359 (Ind.1999). The Court agreed, however, that the Court of Appeals in

*Illinois–Indiana Cable* had correctly determined that Subsection 83(a) confers no jurisdiction in the Commission where the utility leases a "'divisible part of a utility's works'" to a third party. *Id.* (quoting *Illinois–Indiana Cable,* 427 N.E.2d at 1108). The result here is consistent with *Indiana Bell* inasmuch as Indiana Gas has not transferred ownership or control over any indivisible part of its utility system or works to ProLiance.

offers available for that capacity." (R. at 1624.) The Commission approved these settlements. (R. at 1618, 2772, 3098–99.)

The Commission rejected the Opponents' argument that Indiana Gas breached the settlements by transferring its pipeline capacity to ProLiance or by arranging for the "sharing" of revenue from capacity releases through transportation credits. The Commission explained that the releases contemplated in the settlements would be based on Indiana Gas's own determination of what capacity became available *after* its needs were met. The Commission reasoned that ProLiance did not receive from Indiana Gas capacity "available" for release because ProLiance was bound to use that capacity first to meet the needs of the Utilities. Only after those needs are met will capacity become "available" for release within the meaning of the settlements. (R. at 1628–29.)

Moreover, it pointed out that Indiana Gas receives the transportation credit in advance of the release of any capacity by ProLiance and will pass along that entire credit to reduce gas costs. (R. at 1626.) The Commission also found that Indiana Gas's release of capacity to ProLiance was consistent with the settlements long-term release provision because it occurred at "maximum pipeline rates" and created an "unequalled economic value." (R. at 1629, 1631.) The Commission estimated that ProLiance will allow Indiana Gas to reduce its winter service cost over four years by $16 million, a figure far exceeding the $1.8 million it received from capacity releases in 1995. (R. at 1630.) These considerations led the Commission to conclude that Indiana gas did not breach the settlements. (R. at 1630.)

On appeal, Opponents repeat their claim that Indiana Gas breached the settlements by transferring its capacity to an affiliate that has the potential for profiting by selling capacity releases. They also claim that, at the least, Indiana Gas breached the settlements by rendering itself unable to perform its contractual obligations, relying on *Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279 (Ind.Ct.App.1996), *trans. denied.*

 The Opponents' arguments have some allure. It is apparent that what the settling parties anticipated from the settlement is different from what they will now receive. On the other hand, settlements were not ordinary contracts. In proposing the settlements to the Commission, the parties cited Indiana Code §§ 8–1–2–24 8–1–2–25. Indiana Code § 8–1–2–24 allows a public utility to enter an arrangement with its customers or consumers, subject to the Commission's finding that the arrangement is reasonable, just and consistent with the purposes of Indiana Code Chapter 8–1–2. Such settlements are under the Commission's supervision and regulation. *See* Ind.Code § 8–1–2–24. The Commission may order rates and regulations

> as may be necessary to give effect to such arrangement, but the right and power to make such other and further changes in rates, charges and regulations as the Commission may ascertain and determine to be necessary and reasonable, and the right to revoke its approval and amend or rescind all orders relative thereto, is reserved and vested in the Commission, notwithstanding any such arrangement and mutual agreement.

Ind.Code § 8–1–2–25. In other words, a settlement approved by the Commission "loses its status as a strictly private contract and takes on a public interest gloss." *Citizens Action Coalition v. PSI Energy, Inc.*, 664 N.E.2d 401, 406 (Ind.Ct.App. 1996).

Here, the Commission found not only that the settlements were not breached, but *also* that the ProLiance agreements were in the public interest and that the reasonableness of the transportation credit can be explored in pending gas cost adjustment proceedings. (R. at 1651, 1653.) In light of the Commission's factual findings and the substantial deference owed to the

Commission in supervising settlements and even modifying or revoking orders entered attendant thereto, we find no error.

### V. The Public Interest

■ The Opponents finally claim that the Commission used the wrong legal standard to evaluate the public interest under Section 49. They argue that the Commission's public interest analysis focused almost exclusively on the immediate cost impact to customers without sufficiently considering the public interest in preventing abuses associated with affiliate transactions, including excessive charges, lack of arm's-length bargaining and restraint on free competition. Yet the Commission began its analysis by acknowledging that the public interest is not confined to customer interests and that it encompasses "a wide range of considerations" including the concerns that the Opponents identify. (R. at 1613.)

The Commission accordingly considered much more than just the cost effect to consumers. It examined Indiana Gas's earlier settlements and the negotiations surrounding ProLiance's formation. It considered the lack of competitive bidding in the formation of what became ProLiance, but it found that the Utilities would be unable to match ProLiance's benefits by using a non-affiliated supplier. (R. at 1616, 1618–19.) It noted too that anti-competitive price patterns have not emerged, that ProLiance has not detrimentally affected the gas transportation market, and that ProLiance has left "the affected markets ... as robust after the formation of ProLiance as they were prior to its formation." (R. at 1636–37, 1650.)

Regarding its continuing ability to monitor the effects of ProLiance, the Commission found, as we do, that gas cost adjustment proceedings will allow the Commission to ensure that charges for gas, as well as the transportation credit and administration fee, are reasonable. Similarly, the Commission explained that it could scrutinize any un-

reasonable rate impact resulting from ProLiance in a rate proceeding. (R. at 1615.)

These findings dispel the Opponents' argument that the Commission's public interest determination was too limited.

### Conclusion

We affirm the Commission's order.

DICKSON, SULLIVAN, and BOEHM, JJ., concur.

RUCKER, J., not participating.